## A/S APOTHEKERNES LABORATORI-UM FOR SPECIALPRAEPARATER, Plaintiff–Appellant,

v.

## I.M.C. CHEMICAL GROUP, INC. and Dr. M.B. Gillis, Defendants–Appellees.

No. 88–1326.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1988.

Decided April 18, 1989.

Robert Shapiro, Barack Ferrazzano Kirschbaum & Perlman, Chicago, Ill., for plaintiff-appellant.

John J. Arado, Wildman Harrold Allen & Dixon, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

This is a diversity case arising from Apothekernes' unsuccessful attempt to purchase the Biochemical Division of IMC. The parties negotiated for some months in an attempt to reach an agreement on the terms of the sale. In February of 1978, the two companies' negotiators were finally able to agree on all terms. However, IMC's board of directors refused to approve the deal. Apothekernes filed this action asserting state law claims of breach of contract, fraud and estoppel. Following a bench trial, the district court, 678 F.Supp. 193 (N.D.Ill.1988) entered judgment in favor of IMC on all counts. We affirm.

### I

Apothekernes brought this suit against IMC on the theories of breach of contract, fraud and estoppel, seeking damages and specific performance of what it perceived as a consummated deal for the sale of IMC's Biochemical Division. The district court initially granted summary judgment for IMC on the breach of contract and estoppel claims (leaving only the charges of fraudulent misrepresentation) and certified the dismissal of those counts for immediate appeal under Federal Rule of Civil Procedure 54(b). We dismissed that appeal for lack of jurisdiction holding that the claims certified for appeal were not "separate in a Rule 54(b) sense" from the claims the district court had retained. *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 725 F.2d 1140, 1143 (7th Cir.1984).

The case then proceeded to a bench trial and the district court made the following findings of fact and conclusions of law. In March of 1977, Apothekernes, through its

president, E.W. Sissener, began negotiating with IMC and its president and chief executive officer, Dr. M.B. Gillis, for the purchase of various of IMC's assets. During the month of December in 1977, the scope of the deal had narrowed to the point that the parties were talking about the purchase of certain, though not all, of IMC's Terre Haute plant facilities. On the 9th of December 1977, the parties signed a letter "intended to set forth the terms upon which we and/or our nominee intend to negotiate and consummate an Agreement of Sale relative to the purchase of certain assets of the Biochemical Division of IMC...." The letter set forth and delineated those matters upon which Sissener and Gillis had previously reached substantial agreement, as well as those issues that required further negotiation. The letter then concluded that "[a]ll of the above is subject to our concluding an Agreement of Sale which shall be acceptable to the Boards of Directors of our respective corporations, whose discretion shall in no way be limited by this letter ... In the interim, [IMC] agree[s] not to initiate negotiations or discussions intended to lead to negotiations with others for the sale of these same assets." Finally, the letter provided for an Agreement of Sale to be executed within 60 days of December 9, 1977.

Initially, the court found that the December 9, 1977 letter of intent did not constitute a binding contract for the sale of IMC's assets, but that it did serve to obligate both parties to bargain in good faith with the goal of eventually reaching agreement. According to the district court, although negotiations proceeded in good faith, by February 23, 1978 the parties still had not resolved their differences on three matters that the court considered "deal breakers." The court concluded that because the sixty day period in which the parties had agreed to execute a final agreement had expired, Gillis was no longer obligated to continue negotiations and could have broken them off at any time. Nonetheless, Sissener capitulated on the three points of contention on February 24, and the court found that at that time, the parties had reached a "meeting of the minds

on all substantial terms." The court specifically found that up to this point, Gillis had negotiated in good faith and had reached agreement with Sissener.

According to the district court, the February 24 meeting of the minds did not, however, constitute a binding contract of sale. Though it determined that the lack of a final executed written draft did not preclude finding an intent to contract on February 24, it did find that the board approval provision in the December 9 letter of intent prevented the formalization of a binding contract absent the approval of IMC's board of directors. The court also found that though Gillis "had perhaps indicated to Sissener his confidence that board approval would be forthcoming, there was no certainty that it would be granted." Instead, the district court found that the board approval provision was explicit in the letter of intent; Gillis had neither the authority nor the apparent authority to bind IMC to the sale of substantial corporate assets, especially when the deal would have involved joint use of a production facility. Nor was the board bound by the letter of intent to accept the terms of the February 24 deal, even though it was reasonably in accord with the terms in the letter of intent; the letter of intent explicitly reserved to the board unlimited discretion to either accept or reject the deal.

Before taking the agreement to the IMC board of directors for approval, Gillis initially went to discuss the matter with Lenon, the president of IMC's parent, as he told Sissener he would do. The court found that at the Gillis–Lenon meeting, Gillis did not take it upon himself to advocate the agreement, but rather focused on the protracted nature of the negotiations leading up to the agreement. Lenon in turn summarily rejected the deal. Lenon's decision was, according to the district court, binding on Gillis and IMC's board of directors. Accordingly, Gillis convened a telephone meeting of the board and induced them to reject the sale. The court concluded that the fact that the board's decision was not an independent one, but instead was a rubber-stamp for Lenon's decision,

was in no way improper. It found that Lenon could reject the sale to the same extent that the IMC board could reject the sale. Having determined that the letter of intent reserved to the board of directors the right to reject the deal, the court concluded that, "[b]efore there was a contract the IMC board had to approve what its negotiator had approved, and the IMC board would not approve unless Lenon approved, and Lenon said no. There was no contract." Accordingly, the district court entered judgment in favor of IMC on all counts, which judgment Apothekernes now appeals.

## II

Apothekernes presents two arguments on appeal. First, it argues that the February 24 meeting of the minds constituted a binding contract which IMC breached by refusing to go through with the proposed sale. Alternatively, Apothekernes argues that the December 9 letter of intent imposed a duty upon IMC to negotiate in good faith, which IMC breached when its board of directors rejected the proposal. We address each of these arguments.

### A. The February 24 Meeting of the Minds

■ The district court found that on February 24, following Sissener's capitulation on the three deal-breaking points, Sissener and Gillis had reached a meeting of the minds on all substantial points. All that remained to be accomplished was to formalize the agreement in writing and obtain the approval of the boards of directors of both parties. The question is whether either of these remaining steps were prerequisites to the formation of a binding contract, or whether the meeting of the minds in and of itself served to bind both parties to the sale.

Under Illinois law, courts focus on the parties' intentions to determine whether an enforceable contract comes into being during the course of negotiations, or whether some type of formalization of the agreement is required before it becomes binding. *Itek Corporation v. Chicago Aerial Indus-*

*tries, Inc.,* 248 A.2d 625, 629 (Del.1968) (applying Illinois law). The fact that some matters may have been left for future agreement does not necessarily preclude a finding of intent to contract during preliminary negotiations. *Borg–Warner Corp. v. Anchor Coupling Co.,* 16 Ill.2d 234, 243–44, 156 N.E.2d 513, 517–18 (1958). Courts look to all of the circumstances surrounding the negotiations, including the actions of the principals both during and after, to determine what the parties intended. *Itek,* 248 A.2d at 629. The intent of the parties in circumstances such as these is a question of fact, and we will not set aside the fact finder's determination on this issue unless it is clearly erroneous. *Lambert Corp. v. Evans,* 575 F.2d 132, 136 (7th Cir.1978); *See also Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.,* 114 Ill.2d 133, 141–42, 102 Ill.Dec. 379, 382, 500 N.E. 2d 1, 4 (1986).

In this case, the district court made two factual findings regarding what IMC and Apothekernes intended. First, it found that the parties did not intend the lack of a formally drawn and executed agreement to prevent formation of a binding obligation. Nevertheless, the court concluded that the absence of approval by IMC's board of directors prevented a finding that the parties intended to be bound by their February 24 meeting of the minds. In making this determination, the district court relied on the specific terms recited in the December 9 letter of intent as well as the circumstances surrounding the transaction itself. The letter explicitly stated that its terms were, "subject to our concluding an Agreement of Sale which shall be acceptable to the Board of Directors of our respective corporations, whose discretion shall in no way be limited by this letter...."

Apothekernes introduced evidence tending to suggest that the board approval provision did not mean what it appeared to mean; instead, they argued, it only required the negotiators to obtain early acceptance of the deal, as outlined in the letter of intent, from their companies' "key people." The district court implicitly rejected this version of the role the respective

parties intended for their boards of directors. Instead, it found that the board approval provision made it clear that Gillis "had neither the authority nor the apparent authority ... to bind IMC to a disposition of substantial corporate assets" without action by the board of directors. And though Apothekernes argues that Gillis assured Sissener the IMC board would okay any deal he made, the language in the letter of intent should have put Sissener on notice that any promises by Gillis of rubber-stamp board approval were not to be taken seriously.[1] *See Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1058–59 (7th Cir.1988) (experienced businessman should proceed with caution when confronted with oral representations directly contrary to limiting terms of written contract.) Thus, we conclude that the district court's finding that the parties did not intend to be bound by the February 24 meeting of the minds because of the absence of approval by IMC's board of directors was not clearly erroneous. There was no contract for the sale of IMC's assets to Apothekernes and therefore there was no breach.

### B. Breach of Duty to Negotiate in Good Faith

██ Apothekernes also argued unsuccessfully in the district court that the December 9 letter of intent constituted a binding contract for the sale of IMC's assets. The district court correctly rejected this argument; as we recently stated in *Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053 (7th Cir.1988), the purpose and function of a preliminary letter of intent is not to bind the parties to their ultimate contractual objective. Instead, it is only "to provide the initial framework from which the parties might later negotiate a final ... agreement, if the deal works out." *Id.* at 1056; *Teachers*

*Insurance and Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987). The district court nonetheless concluded that the December 9 letter of intent did impose upon the parties an obligation to negotiate in good faith. We agree that that conclusion was proper; a number of courts, including this court, have held that the terms of a letter of intent may impose such a duty. *Channel Home Centers v. Grossman*, 795 F.2d 291, 299 (3d Cir.1986); *Chase*, 744 F.2d at 571; *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d Cir.), cert. denied, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Teachers Insurance*, 670 F.Supp. at 499; *Itek*, 248 A.2d at 629. Apothekernes argues that even if IMC did not breach a contract of sale, it did breach this duty to negotiate in good faith.

The obligation to negotiate in good faith has been generally described as preventing one party from, "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Teachers Insurance*, 670 F.Supp. at 498. For instance, a party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal because of an unfavorable change in market conditions. *Id.* at 506. The full extent of a party's duty to negotiate in good faith can only be determined, however, from the terms of the letter of intent itself. For example, our recent decision in *Feldman v. Allegheny International, Inc.*, 850 F.2d 1217 (7th Cir.1988), demonstrates how the terms of the letter of intent control the scope of the obligation to bargain in good faith. In that case, the letter provided only that the potential seller would not "hold discussions or negotiate with any person

---

1. Though the court did recognize that "Gillis had perhaps indicated [to Sissener] his confidence that board approval would be forthcoming," it did not treat such assurances on Gillis' part as misrepresentations regarding his authority, but instead concluded that there was no guarantee of board approval. Citing *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 569 (7th

Cir.1984) on this point, the court apparently believed that, even had such representations been made, Sissener's reliance on them would not have been reasonable in light of the magnitude and complexity of the transaction, "particularly where, as here, the parties contemplated joint use of a production facility."

other than [the potential buyer] ... while the proposed acquisition [was] being pursued." 850 F.2d at 1219. With the exception of setting a minimum cash component for the proposed sale, the letter did not set forth any previously agreed upon terms much less provide a general framework within which the parties intended to conduct their negotiations. As it turned out, such a commitment was not much of a commitment at all. It simply bound the seller to negotiate exclusively with the buyer in good faith until they disagreed; this was the full extent of the parties' obligation. In the absence of any agreed upon terms or even a general framework within which to conduct the negotiations, the parties were free to insist on or reject any proposed terms to the contract that they wished. As we explained in *Feldman,*

> In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party. The proper recourse is to walk away from the bargaining table, not to sue for "bad faith" in negotiations.

*Id.* at 1223. Thus, the scope of any obligation to negotiate in good faith can only be determined from the framework the parties have established for themselves in their letter of intent.

Here, the district court found that Gillis did negotiate in good faith at all times and that he did reach agreement with Sissener

on all substantial terms on February 24. In claiming that this duty was breached, Apothekernes does not argue that any of Gillis' actions leading up to the February 24 meeting of the minds evidenced bad faith in negotiation; it does not argue that Gillis insisted unreasonably on terms not contained in the letter of intent or attempted to alter terms already agreed upon. Instead, it argues that Gillis' obligations continued even after he and Sissener had reached agreement on the disputed terms. In short, Apothekernes argues that once the issues had been hammered out, IMC was further obligated by the letter of intent and its corresponding duty to negotiate in good faith to go ahead and approve the deal. The letter of intent, however, "was merely an agreement to *negotiate,* not a promise that those negotiations would be fruitful." *Feldman,* 850 F.2d at 1223 (emphasis added). A duty to *negotiate* in good faith does not encompass an automatic duty to approve the final deal. A letter of intent is no guarantee that the final contract will be concluded, even if the parties fulfill their good faith obligations. *Teachers Insurance,* 670 F.Supp. at 498.

Nor does the obligation to negotiate in good faith encompass any duty on the negotiator's part to advocate the deal to the ultimate decision maker. Apothekernes argues that Gillis breached his good faith duty by failing to more vigorously advocate the deal when he took it to Lenon for approval. In advancing this argument, Apothekernes erroneously relies upon broad principles dealing with the common law duty to perform contracts in good faith.[2] Here, Gillis' duty to engage in good

2. For instance, Apothekernes invokes the general proposition that where the performance of a condition precedent to a contract is within the control of one of the contracting parties, that party must use "reasonable efforts" to make the condition occur. *Dodson v. Nink,* 72 Ill.App.3d 59, 64, 28 Ill.Dec. 379, 382, 390 N.E.2d 546, 549 (1979). On this basis, it argues that Gillis had to use "reasonable efforts" to get board approval. This argument has two flaws. First, it presumes that Gillis had some control over the board's decision to accept or reject the deal, where the district court expressly found that he did not. According to the court, neither Gillis nor the IMC board of directors were in a position to say

no to Lenon once he had decided to reject the deal. Second, and more important, Apothekernes is relying on a rule of *contract* construction in a situation where, as we have previously stated, a binding contract of sale never existed. The implied duty of good faith and fair dealing in the performance and enforcement of contracts, (which courts read into virtually every contract, *Foster Enterprises v. Germania Federal Savings,* 97 Ill.App.3d 22, 28, 52 Ill.Dec. 303, 308, 421 N.E.2d 1375, 1380 (1981)), must be distinguished from the duty to negotiate in good faith that arises from a preliminary letter of intent. *Channel Home,* 795 F.2d at 299 n. 8;

faith negotiations arose from the preliminary letter of intent, which established the framework for the negotiation process. It did not arise from principles of common law. Because nothing in the letter of intent provided that Gillis must act as an advocate for the proposed sale, he had no duty to do so.

Apothekernes somehow asks us to extend the scope of IMC's duty to negotiate in good faith even further, by arguing alternatively that Lenon either was obligated to approve the agreement, or that his ability to exercise his discretion to accept or reject the deal was in some way limited. Once again, Apothekernes mistakenly relies on authority dealing with the common law duty of good faith in performance of an existing contract, where courts have held that, in some circumstances, that duty may impose limits on a contractual party's ability to exercise its discretion, requiring that party to act reasonably, and not "arbitrarily or capriciously." *See Foster Enterprises*, 97 Ill.App.3d at 30, 52 Ill.Dec. at 304, 421 N.E.2d at 1381 (1981) (party to contract obligated to accept "reasonable market value" appraisal of property subject to sale). As we have repeatedly stated, however, there was no contract for the sale of IMC's assets to Apothekernes in this case. Therefore, there is no basis for inferring any limits on Lenon's or the IMC board's ability to exercise their discretion. What IMC did agree to by signing the letter of intent was to negotiate in good faith in an attempt to reach agreement, which it did, fulfilling its obligations to Apothekernes. The letter of intent specifically reserved to the IMC board of directors the discretion to accept or reject the sale, which it exercised through Lenon. Accordingly, there was no breach of the duty to negotiate in good faith.

### III

In conclusion, we hold that there was no contract for the sale of IMC's Biochemical Division to Apothekernes; therefore, there was no breach. Although IMC did agree to negotiate in good faith, it did not breach that duty. Accordingly, judgment in favor of IMC is

AFFIRMED.

*Teachers Insurance,* 670 F.Supp. at 498; Restatement of Contracts (Second) § 205 comment (c). Though the first type of duty of good faith may encompass an implied obligation to use "reasonable efforts," the scope of the duty to negotiate in good faith, as we have heretofore stated, is defined solely by the terms of the letter of intent. We refuse to read into the letter of intent language that does not exist.