**BERCOON, WEINER, GLICK AND BROOK, an Illinois partnership, Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY, a New York Corporation, Defendant.**

No. 91 C 7955.

United States District Court, N.D. Illinois, E.D.

March 23, 1993.

Steven A. Weiss, Schopf & Weiss, Chicago, IL, for plaintiff.

William Joseph Kunkle, Jr., Raymond Francis Benkoczy, Michael M. Marick, Pope & John, Ltd., Chicago, IL, for defendant.

William Joseph Kunkle, Jr., Raymond Francis Benkoczy, Michael M. Marick, Pope & John, Ltd., Chicago, IL, for third-party plaintiff.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This is a contract action growing out of commercial lease negotiations which turned sour. This case comes before the court on

the defendant's Rule 12(b)(6) motion to dismiss plaintiff's amended complaint. Jurisdiction is based on diversity; both parties agree that Illinois law is controlling on the merits of the case. This court finds that plaintiff has failed to state a cause of action for breach of contract, breach of a good faith duty to negotiate, common law fraud or a violation of the Illinois Consumer Fraud Act. Accordingly, Counts I, II, IV and V of plaintiff's complaint are dismissed. Because the plaintiff has adequately plead a cause of action for promissory estoppel, defendant's motion to dismiss Count III of plaintiff's complaint is denied.

## FACTS AND BACKGROUND

In October 1990, the plaintiff, Bercoon, Weiner, Glick and Brook ("BWGB") entered negotiations with the defendant, Manufacturers Hanover Trust Co. ("Manufacturers Hanover") to sublease from defendant space at 10 N. LaSalle Street, Chicago. At that time, plaintiff leased space at 225 N. Michigan Street in Chicago. The lease on the 225 N. Michigan premises was not due to expire until January 31, 1997, but provided an option for early January 31, 1992 termination, exercisable by plaintiff if it gave notice by January 31, 1991 and paid $92,815.46 in buyout costs. During these negotiations, various offers and counter-offers were made regarding leasing the 10 N. LaSalle premises.

On January 25, 1991, six days before the option expiration date, the defendant delivered to the plaintiff an eight page document identified as a "revised proposal", "superseding [all] previous offers" to plaintiff. This proposal contained numerous detailed terms and conditions relating to the lease of the 10 N. LaSalle space. It is not disputed that substantially all of the pertinent details relevant to the lease were included. Of central importance in this revised proposal was the security deposit provision, which required plaintiff to apply for a standby $95,000 letter of credit within three days after plaintiff signed the formal sublease. In addition, the proposal provided that defendant would reimburse plaintiff for its 225 N. Michigan lease buyout costs after "a mutually agreeable sublease has been executed and delivered by both parties ... subject to Overland-lord's written approval of the sublease." Finally, the last paragraph of this revised proposal read:

> Notwithstanding anything to the contrary herein contained, this proposal constitutes the general economic terms of Manufacturers Hanover's proposal to enter into a lease for the subject space. No legal or equitable obligations are imposed on either Manufacturers Hanover or BWGB unless and until a sublease is executed and delivered by Manufacturers Hanover and BWGB.

The proposal requested plaintiff to sign and return "the letter" if it found the revised terms and conditions acceptable, and to indicate any required additions or clarifications to the proposal. Plaintiff signed the revised proposal on January 26, 1991, after making and initialing several revisions to it. Notably, plaintiff proposed revising its obligation to apply for security deposit funds from three days after it signed a formal lease to three days after Manufacturers Hanover delivered a fully executed lease to BWGB. Along with a cover letter stating "The additions to the letter are for clarification only", plaintiff's attorney delivered the signed revised proposal to defendant on January 28, 1991.

On January 31, 1991, plaintiff exercised its option to terminate its lease at 225 N. Michigan, paying the buyout costs. On February 1, 1991, Manufacturers Hanover sent BWGB a formalized draft of the sublease for BWGB's review which contained terms in substantial accordance with those in the January 25, 1991 proposal. Subsequently, on approximately February 20, 1991, defendant informed plaintiff that a $700,000 letter of credit would be required as a security deposit before the sublease could be executed. Plaintiff refused to pay this amount. Because BWGB had already exercised its lease termination option, effective February 1, 1992, it was required to seek other leasing arrangements on short notice. BWGB eventually leased space at 125 S. Wacker Drive in Chicago.

On August 4, 1992, plaintiff filed a five count amended complaint against Manufacturers Hanover in this court, seeking to recover damages allegedly incurred by it as a

result of the defendant's actions. Plaintiff attached to the complaint a copy of the January 25, 1991 proposal, a schedule for computing rent allowance due BWGB under the revised proposal as compensation for its build-out costs, and the January 28, 1991 letter from BWGB's attorney to Manufacturers Hanover. Four counts of plaintiff's complaint were based on Manufacturers Hanover's change in the security deposit requirement, which plaintiff alleged constituted; (1) a breach of contract; (2) a breach of its duty to negotiate in good faith; (3) common law fraud; and (4) a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, pars. 261–272. The other count of plaintiff's complaint, based on statements allegedly made by the defendant, alleges the defendant is estopped to deny the existence of a contract with BWGB.

## DISCUSSION

■ The standard governing a decision on a Rule 12(b)(6) motion to dismiss is well established. Only if the allegations of the complaint, and all reasonable inferences drawn therefrom, cannot support any cause of action may this court grant the motion. *See generally,* Charles Wright & Arthur Miller, 5A *Federal Practice and Procedure: Civil 2d* § 1357 (West Publishing, 2d ed. 1990). The court must interpret ambiguities in the complaint in favor of the plaintiff, and plaintiffs are free, in defending against the motion, "to allege without evidentiary support any facts [they] please[ ] that are consistent with the complaint in order to show that there is a state of facts within the scope of the complaint that if proved ... would entitle [them] to judgment." *Early v. Bankers Life & Casualty Co.,* 959 F.2d 75, 79 (7th Cir. 1992). Under this standard of review, a Rule 12(b)(6) motion to dismiss will be granted when it appears that the plaintiff can prove no set of facts entitling it to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984).

*Count I: Breach of Contract*

■ BWGB alleges that the January 25, 1991 revised proposal constituted a binding contract to lease the space at 10 N. LaSalle St. To properly assert a breach of contract

under Illinois law, the complaint must allege facts that reasonably infer that: (1) a contract existed between the plaintiff and defendant; (2) plaintiff performed its obligations under the contract; (3) defendant breached its obligations under the contract; and (4) plaintiff suffered damages as a proximate result of the breach. *Berg and Assoc., Inc. v. Nelsen Steel & Wire Co.,* 221 Ill.App.3d 526, 536, 162 Ill.Dec. 779, 580 N.E.2d 1198 (1991), *appeal denied,* 143 Ill.2d 635, 167 Ill.Dec. 396, 587 N.E.2d 1011 (1992). Plaintiff's Complaint fails to allege the first of these elements, the existence of a contract.

■ Illinois law holds that the intent of the parties controls the question of whether a contract exists. *Connecticut Gen. Life Ins. Co. v. Chicago Title & Trust Co.,* 714 F.2d 48, 50 (7th Cir.1983). Intent is to be measured objectively, and when a written document is the basis for plaintiff's allegations that a binding contract exists, intent must be "determined solely from the language used when no ambiguity in its terms exists." *Empro Mfg. Co. v. Ball–Co Mfg., Inc.,* 870 F.2d 423, 424 (7th Cir.1989). Where there is no ambiguity in the writing, a court cannot entertain parol evidence as an aid to divining the parties intent. *Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 288, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990).

The revised proposal signed by BWGB and Manufacturers Hanover is exactly the type of unambiguous writing alluded to in *Empro* and in *Quake Construction.* The words of this proposal, as well as plaintiff's proposed amendments to it, indicate neither party contemplated that it was binding upon them. Manufacturers Hanover prefaced the revised proposal by requesting that BWGB note any places it felt additions to or clarifications of the terms were necessary. In addition, Manufacturers Hanover concluded the revised proposal by stating its "proposal" constituted "*general* economic terms" (emphasis added) and that no obligations, legal or equitable, would be imposed on either party until a formal sublease had been executed by them. Taken together, these terms do not reasonably indicate that the revised proposal was intended to be a final agreement, but instead, shows the letter merely "set the stage for

negotiations on details." *See Empro Manufacturing,* 870 F.2d at 426.

Plaintiff urges this court to apply the reasoning in *Quake Construction* to the facts here and to find that Manufacturers Hanover's written revised proposal created at least an ambiguity as to the parties' intent. The language of the purported contract in *Quake Construction,* however, differs substantially from that here.[1] In *Quake Construction,* the Illinois Supreme Court denied the defendant's motion to dismiss the plaintiff's breach of contract complaint, holding that contradictory language in the defendant's letter of intent created ambiguity as to whether the letter was intended to bind the parties. *Id.* at 289–94, 152 Ill.Dec. 308, 565 N.E.2d 990. The Court found particularly relevant language requiring plaintiff begin performance only a few days after the letter was delivered. This, the Court reasoned, indicated that the parties contemplated commencing performance *prior* to entering a formalized contract.

Also found relevant in *Quake Construction* was a clause allowing the defendant to cancel the letter if the parties could not reach an agreement on the terms of the formal contract. The Court held this clause was susceptible to two separate and contradictory meanings: (1) that the parties did not intend to be bound until they reached a formal agreement; or (2) that the term "cancel" exhibited an intent to be bound "because no need would exist to provide for the cancellation of the letter unless the letter had some binding effect." *Id.* at 294, 152 Ill.Dec. 308, 565 N.E.2d 990. The *Quake Construction* Court concluded that this ambiguity required

the trial court to entertain parol evidence as to the parties' intent.

In contrast to *Quake Construction,* there is no contradictory language in Manufacturers Hanover's revised proposal, nor is the language susceptible to different meanings. First, there is no language regarding mandatory start dates for the lease. Second, the proviso at the end of the revised proposal explicitly states that no obligation would be imposed on either party *until* a formal sublease was executed. This language demonstrates that executing the sublease was a condition precedent to performance, not that a contract was formed subject to failure upon a condition subsequent (i.e., failure to execute a sublease).[2]

Plaintiff's actions with respect to the revised proposal bolster this interpretation. Plaintiff made several changes to the proposal, including altering when its performance obligations would commence under the security deposit provision. This alteration indicated plaintiff did not intend to become obligated until the sublease was *fully* executed. Plaintiff's attorney indicated that the changes were "for clarification only." The import of these "clarifications" was not explained; as noted in *Empro Manufacturing,* the word "clarification" is a clear indicator that the deal is not yet done. 870 F.2d at 426.

In sum, as respects count I, while it is true that "the fact that parties contemplate that a formal agreement will eventually be issued does not render prior agreements mere negotiations", *Quake Construction,* 141 Ill.2d at 287, 152 Ill.Dec. 308, 565 N.E.2d 990 (quoting *Chicago Investment Corp. v. Dolins,* 107

---

1. Another case cited by plaintiff, *Dawson v. General Motors Corp.,* 977 F.2d 369 (7th Cir.1992), is also factually distinguishable from the instant case. The purported contract in *Dawson* consisted of several letters between the parties. The court held these letters were ambiguous as to the parties' intent. Unlike the revised proposal in the instant case, the language in the *Dawson* correspondence did not unambiguously disclaim an intention to create obligations binding either party. *Id.* at 373–74.

2. The language of the revised proposal is, in fact, much closer to that in *Terracom Dev. Group, Inc. v. Coleman Cable & Wire Co.,* 50 Ill.App.3d 739, 8 Ill.Dec. 642, 365 N.E.2d 1028 (1977), a case

cited by the *Quake Construction* court as distinguishable from its facts. Like Manufacturers Hanover's revised proposal, the document delivered by the defendant to plaintiff in *Terracom* explicitly stated it created no binding obligations upon either party until a formal written agreement was executed. In addition, the plaintiff in *Terracom,* like BWGB, "accepted" the terms of the proposal subject to certain changes. The *Terracom* court held that the language of the "letters passing between the parties" made "patently" clear that the parties did not intend to be bound "to the transaction until both had signed a formal and definitive contract." *Terracom,* 50 Ill.App.3d at 744–45, 8 Ill.Dec. 642, 365 N.E.2d 1028.

Ill.2d 120, 126–27, 89 Ill.Dec. 869, 481 N.E.2d 712 (1985)), it is equally true that "parties may specifically provide that negotiations are not binding until a formal agreement is in fact executed." *Id.* The negotiations between BWGB and Manufacturers Hanover represent precisely the latter scenario. Accordingly, Count I of plaintiff's complaint is dismissed for failure to allege adequately the existence of a contract.

*Count II: Breach of Good Faith*

■ BWGB alleges that even if the signed January 25th revised proposal was not intended to be a binding contract between the parties, it nevertheless constituted a binding agreement to conduct good faith negotiations to make final the terms and conditions of the sublease. Amended Complaint ¶ 42. BWGB alleges that Manufacturers Hanover breached this duty of good faith by insisting on terms not contained in the revised proposal and by attempting to alter terms already agreed upon. In particular, BWGB alleges that defendant unreasonably increased its security deposit requirement from $95,000 to $700,000, insisted on conditions not common to lease transactions, and "reneged" on or insisted upon conditions directly contradicting those in its January 25th revised proposal. Amended Complaint ¶¶ 33, 43.

■ Although BWGB alleges facts which might arguably support a theory of *breach* of a duty to negotiate in good faith, it has not alleged sufficiently the *existence* of a duty to so negotiate in the first place. The complaint does not allege adequately that the parties intended that the signed revised proposal create a binding agreement to negotiate in good faith a contract based on the terms of the proposal. In the formation stage of a contract the duty of good faith is weak. *First Nat'l Bank v. Atlantic Tele-Network Co.*, 946 F.2d 516, 520 (7th Cir. 1991). Unlike the duty of good faith imposed by courts with respect to contract *performance*, there is no inherent duty of good faith with respect to contract *formation. A/S Apothekernes Laboratorium for Special-praeparater v. I.M.C. Chemical Group, Inc.*,

873 F.2d 155, 159 & n. 2 (7th Cir.1989). The scope of an obligation to negotiate in good faith is determined not by reference to principles of common law, but by the framework the parties have established for themselves in any prior agreements or letters of intent. *A/S Apothekernes*, 873 F.2d at 159–60; *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223–24 (7th Cir.1988). In short, the terms of any prior agreements control on the question of whether a duty to negotiate in good faith was created.

■ The terms of the Manufacturers Hanover revised proposal of January 25, as signed by BWGB, do not create such a duty. Plaintiff implies that because the terms contained in the revised proposal were explicit and embodied the essential terms of the sublease, they created a duty to negotiate further in good faith. Nevertheless, definite terms by themselves do not create a duty of good faith in further negotiations; there must also be explicit language in the document that indicates good faith negotiations were contemplated. *Feldman*, 850 F.2d at 1223.

An example of a letter of intent creating a duty to negotiate in good faith can be found in *A/S Apothekernes*, 873 F.2d at 155, where the letter stated it was "intended to set forth the terms upon which we and/or our nominee intend to negotiate and consummate an agreement of sale...." The court reasoned this language contemplated an effort to use reasonable efforts to complete the deal. The court also observed that the letter delineated which terms had been substantially agreed upon, as well as which terms still required more negotiation. *Id.*[3]

The facts in *A/S Apothekernes* are in contrast to those in *Feldman*, where the court held a letter of intent created only a duty to negotiate exclusively with each other while the proposed sale was being pursued. *Feldman*, 850 F.2d at 1223. Because the letter left open many terms, and did not define the parameters of what terms could be offered,

---

**3.** Another example of a letter of intent explicitly requiring future negotiations to be conducted in good faith is found in *Altheimer & Gray v. Sioux Mfg.*, 983 F.2d 803, 806–07 (7th Cir.1993), in which the letter provided that transaction details were to "be discussed further by Seller and Buyer and agreed to in good faith...." and that "all parties are hereby bound in good faith to attempt to fulfill all ... conditions."

the court held no duty was created to negotiate in good faith over terms. *Id.*

The language in Manufacturers Hanover is more appropriately compared to that in *Feldman* than to that in *A/S Apothekernes*. It is true that, unlike the letter of intent in *Feldman*, the revised proposal set forth detailed terms and conditions regarding the proposed lease. This, however, does not end the inquiry. No language in the revised proposal makes references to any prior agreements between Manufacturers Hanover and BWGB, nor does the language reflect an intent by each party to make reasonable efforts towards consummating the deal. The cover letter to the revised proposal merely instructed the agent for BWGB to "review the revised terms and conditions and if they are acceptable to your client, have your client indicate so by signing and returning a copy of the letter." The letter also instructs BWGB to indicate where clarifications or additions were required. In essence, the revised proposal offered sublease terms and conditions acceptable to Manufacturers Hanover, and invited BWGB to comment, disagree or acquiesce to them.

This court is not unmindful of the substantial increase in the amount of security deposit demanded by Manufacturers Hanover, and it is aware that this demand was made after BWGB had signed the revised proposal and had terminated its existing lease. This action by BWGB changed the negotiating posture between the two parties. No formal agreement had been entered, yet BWGB no longer had its bargaining chip; electing to remain in its existing lease. BWGB now had to find new space before January 31, 1992, instead of January 31, 1997. This gave Manufacturers Hanover increased leverage over the terms in the 10 N. LaSalle lease; BWGB had, in a sense, gone past the point of no return.

Unfortunately for BWGB, there was no language in the revised proposal that prevented Manufacturers Hanover from implementing its negotiating advantage in the manner that it did. It may be true, as plaintiff argues, that the defendant increased its security deposit demand to force BWGB to back out of the lease negotiations in favor of a more lucrative deal with another potential lessee. Nonetheless, although Manufac-

turers Hanover's actions may be characterized as a sharp business practice, they are not actionable where no duty to negotiate in good faith existed. "In a business transaction, both sides presumably try to get the best of the deal." *Feldman*, 850 F.2d at 1223. Where there is no agreement to temper this business interest, actions taken in furtherance of such interest cannot be characterized as a breach of good faith. *Id.* In the absence of more explicit language in the revised proposal regarding the shape of further negotiations between the parties, Manufacturers Hanover was free to change, alter or withdraw previously proposed terms as it saw fit. Accordingly, Count II of plaintiff's complaint, alleging a breach of a good faith duty to negotiate, is dismissed.

*Counts IV and V: Fraud and Deceptive Business Practice Allegations*

Counts IV and V of plaintiff's complaint center on alleged misrepresentations of fact made by Manufacturers Hanover to BWGB during the course of their lease negotiations. Both counts involve the same factual allegations; plaintiff maintains that Manufacturers Hanover wilfully misrepresented the amount of security deposit needed in order to induce the plaintiff to continue negotiating and enter a sublease agreement. Amended Complaint ¶¶ 54, 62. BWGB alleges that this alleged misrepresentation constituted both common law fraud and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), Ill.Rev. Stat. ch. 121½, ¶¶ 261–272. Because both counts involve the same alleged facts, the court addresses them together.

■ In order to state a cause of action for common law fraud in Illinois, the plaintiff must allege the following elements: (1) that a false statement of material fact was made; (2) that the party making the statement knew or believed it to be untrue; (3) that the party to whom the statement was made had a right to rely upon it and did so; (4) that the statement was made for the purpose of inducing the other party to act; and (5) that the party reasonably relied upon the statement to its detriment. *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 185–86, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982); *Connor v. Merrill Lynch*

*Realty, Inc.,* 220 Ill.App.3d ·522, 528, 163 Ill.Dec. 245, 581 N.E.2d 196 (1991), *appeal denied* 143 Ill.2d 636, 167 Ill.Dec. 397, 587 N.E.2d 1012 (1992); *accord General Motors Acceptance Corp. v. Central Nat'l Bank,* 773 F.2d 771, 778 (7th Cir.1985).

The Consumer Fraud Act defines a deceptive business practice as "the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact." Ill.Rev.Stat. ch. 121½, ¶ 262.[4] Although the Act was intended to provide broader protection than common law fraud, *Connor,* 220 Ill.App.3d at 530, 163 . Ill.Dec. 245, 581 N.E.2d 196, examination of Illinois case law interpreting the Consumer Fraud Act reveals a common thread tying together the elements comprising common law fraud and a violation óf the Act: in both causes of action the plaintiff must allege reasonable reliance upon the purported misrepresentation. See *I.K. Corp. v. One Fin. Place Partnership,* 200 Ill.App.3d 802, 816–17, 146 Ill.Dec. 198, 558 N.E.2d 161, *appeal denied* 135 Ill.2d 556, 151 Ill.Dec. 383, 564 N.E.2d 838 (1990). BWGB has failed to allege facts supporting reasonable reliance; therefore, this "common˙ thread" ultimately unravels both plaintiff's fraud count and its Consumer Fraud Act count.

Initially, the premise implicit in plaintiff's allegations is that had Manufacturers Hanover stated from the outset of negotiations that a $700,000˙ security deposit would be required, BWGB would have terminated negotiations with Manufacturers Hanover. Nevertheless, the injuries BWGB alleges it sustained did not result directly from BWGB's continued negotiations. Instead, the alleged injuries flowed from actions BWGB took outside· the negotiation process: it terminated its existing lease, incurring forfeiture costs and other costs associated with the BWGB's subsequent failure to enter a formal lease agreement with Manufacturers Hanover.

This irrevocable change of position by BWGB did not constitute reasonable reliance on Manufacturers Hanover promise of a specified security deposit amount. Assuming that Manufacturers Hanover misrepresented deliberately the size of the security deposit, plaintiff still had to consider that, according to the provisions of defendant's January 25 revised proposal, there was no binding obligation upon either party until a formal lease was executed by both parties. When a proposed term, even if false, is conditioned upon the execution of a formal lease, the party to whom the representation cannot justifiably rely upon it. *I.K. Corp.,* 200 Ill.App.3d at 817, 146 Ill.Dec. 198, 558 N.E.2d 161. Here, until BWGB and Manufacturers Hanover executed a formal sublease, BWGB was ·free to back out of the deal at its˙ convenience.

BWGB was well aware that the security˙ deposit provision proposed by Manufacturers Hanover was contingent upon the execution of a formal sublease by the parties. The ·revised proposal explicitly stated that it did not create any binding obligations upon either party. Echoing the non-binding nature of the proposal, BWGB proposed an amendment to the security deposit provision that would delay its performance obligations until a *fully executed* sublease was delivered to it. Yet despite its knowledge that nothing contained in the revised proposal was binding upon Manufacturers Hanover, BWGB still terminated its existing lease before the 10 N. LaSalle lease was executed. Under Illinois law, this type of reliance is simply not reasonable. Accordingly, Counts IV and V of plaintiff's complaint are dismissed.

*Count III: Promissory Estoppel*

Count III of BWGB's complaint alleges that Manufacturers Hanover should be estopped from denying the existence of a contract. Under Illinois law, to state a cause of action based on promissory estoppel, the plaintiff must allege that: (1) the defendant made an unambiguous promise to the plaintiff; (2) plaintiff reasonably relied on defendant's promise; (3) plaintiff's .reliance was expected and foreseeable by the defendant; and (4) plaintiff was injured by its reliance. *Quake Construction,* (1990) 141 Ill.2d at 310, 152 Ill.Dec. 308, 565 N.E.2d 990; *I.K. Corp.,* 200 Ill.App.3d at 816, 146 Ill.Dec. 198, 558

---

**4.** This court assumes, without deciding, that the proposed sublease agreement between BWGB and Manufacturers Hanover was a consumer transaction within the reach of the Consumer Fraud Act.

N.E.2d 161; *accord M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1408 (7th Cir. 1991); *Ziese v. Ramada Inns, Inc.*, 463 F.2d 1058, 1060 (7th Cir.1972).

Plaintiff's complaint alleges that Manufacturers Hanover accepted the revisions BWGB made to the terms and conditions of the revised proposal on January 28, 1991. Amended Complaint ¶ 18. Subsequently, plaintiff alleges, defendant's agent informed BWGB they had a "done deal". Amended Complaint ¶ 19. Plaintiff alleges that in reliance upon this representation, and with the knowledge, encouragement and approval of Manufacturers Hanover, it terminated its existing lease and incurred costs associated with fulfilling obligations associated with leasing the 10 N. LaSalle space. Amended Complaint ¶ 30.

Standing alone, defendant's statement that the sublease was a "done deal" was ambiguous. Similar language was found to be unenforceable in *Ziese*, 463 F.2d at 1060, where the defendant told plaintiff to "quit worrying ... you've got a deal." The *Ziese* court held this statement was not unequivocal, and that therefore, promissory estoppel could not be invoked to create a contract.

In addition, the alleged oral promise by Manufacturers Hanover directly contradicted the written terms of the revised proposal, which stated that no binding obligations were to be imposed until a formal sublease was executed. In light of this contradiction, it was not reasonable for BWGB to rely solely on this statement as a basis for terminating its lease. Reliance is not reasonable where the plaintiff has knowledge that final approval of the deal may be withheld, or that any agreement is contingent upon execution of a formal contract. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1408 (7th Cir. 1991); *I.K. Corp.*, 200 Ill.App.3d at 816–17, 146 Ill.Dec. 198, 558 N.E.2d 161.

BWGB's promissory estoppel theory, however, does not rest on this representation alone. BWGB also alleges that Manufacturers Hanover knew that plaintiff had to exercise its option to cancel its existing lease within three days from the "done deal" representation, and that it encouraged BWGB to terminate its existing lease. Amended Complaint, ¶ 30. Construing the alleged "done deal" representation and defendant's alleged encouragement of lease termination together, plaintiff has alleged sufficient facts to support a cause of action for promissory estoppel.

Plaintiff's complaint does not make clear how or when Manufacturers Hanover encouraged or approved BWGB's decision to terminate its existing lease. If the claims of active encouragement were based only on the terms and conditions contained within the revised proposal, then plaintiff's estoppel argument would fail, because BWGB knew the sublease proposal was not binding and enforceable. Thus, any reliance on the terms of the revised proposal would not be reasonable.

It is, however, equally plausible to interpret plaintiff's complaint as alleging that Manufacturers Hanover encouraged BWGB to terminate its existing lease after the revised proposal was signed and returned to the defendant by BWGB, after Manufacturers Hanover allegedly accepted BWGB's revisions to the proposal, and after the defendant allegedly stated the sublease was a "done deal". Although the complaint does not indicate an express promise was made, the promise necessary to invoke promissory estoppel does not have to be express to be enforceable; it may also be inferred from the words and conduct of the defendant. *First Nat'l Bank v. Sylvester*, 196 Ill.App.3d 902, 912, 144 Ill.Dec. 24, 554 N.E.2d 1063, *appeal denied* 133 Ill.2d 555, 149 Ill.Dec. 320, 561 N.E.2d 690 (1990). Here, it may be reasonably construed that the combination of these statements and activities constituted an unambiguous promise by defendant to BWGB that it intended to make final the sublease agreement in substantial accordance with the terms contained in the revised proposal.

Examination of defendant's alleged statements in conjunction with the time frame constraints on the negotiations also supports an inference that Manufacturers Hanover expected BWGB to rely upon its promise, and that such reliance was reasonable. Manufacturers Hanover knew that unless BWGB terminated its existing lease by January 31, 1991, three days after it allegedly stated there was a "done deal," BWGB would be locked into that lease for another five years.

This would be fatal to the proposed deal. It is logical to infer that defendant desired that progress continue on the sublease agreement, a course of action which would require BWGB to terminate its existing lease. Thus, it is reasonable to infer that defendant's "done deal" statement, combined with its encouragement of BWGB to terminate the existing lease, was intended to induce the plaintiff into terminating its existing lease.

The detrimental reliance element necessary to maintain a promissory estoppel action requires little discussion here. Plaintiff's complaint adequately alleges that BWGB sustained injury by relying on the alleged promises made by Manufacturers Hanover to it. Accordingly, defendant's motion to dismiss Count III of plaintiff's complaint is denied.

## CONCLUSION

For the foregoing reasons, Manufacturers Hanover's motion to dismiss Counts I, II, IV, and V, alleging breach of contract, breach of a good faith duty to negotiate, fraud, and violations of the Consumer Fraud Act respectively, is granted. Defendant's motion to dismiss Count III of plaintiff's complaint, alleging promissory estoppel, is denied.