**ELVIN ASSOCIATES, Plaintiff,**

v.

**Aretha FRANKLIN and Crown Productions, Inc., Defendants.**

**No. 85 Civ. 5723 (WK).**

United States District Court,
S.D. New York.

Feb. 2, 1990.

Opinion on Damages April 26, 1990.

</div>

Peter A. Herbert, Eikenberry, Futterman & Herbert, New York City, for plaintiff.

Thomas S. Howard, Kirsch, Gartenberg & Howard, Hackensack, N.J., for defendants.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

After a bench trial of several days,[1] we made preliminary findings on the record in plaintiff's favor, both as to the direct claim that defendants Aretha Franklin and Crown Productions, Inc., breached a contract under which Franklin was to star in a musical production entitled "Sing Mahalia Sing" ("Mahalia"), and as to defendants' counterclaim alleging breach by plaintiff of a second contract relating to the same production. The parties have briefed several legal questions in their post-trial submissions, and in light of that briefing we have somewhat altered the tentative findings of fact and conclusions of law. While we have reconsidered and changed our view that defendants are liable for breach of contract, we do hold defendant Franklin liable to plaintiff on a theory of promissory estoppel. We adhere to our originally expressed view that the counterclaim for breach of contract should be dismissed.

## FACTS

The following recitation of facts is derived from the testimony and exhibits offered at trial, as well as the deposition testimony of defendant Franklin.[2] As this memorandum is not intended for publication, it contains only those facts necessary to permit the parties to understand our factual findings and legal conclusions.

In early 1984 Ashton Springer, the principal of plaintiff Elvin Associates,[3] began efforts to mount a Broadway musical production about the life and music of Mahalia Jackson, and wrote to defendant Aretha Franklin seeking her agreement to appear in the title role.[4] Franklin called Springer and expressed her strong interest in the production, and told Springer to contact her agents at the William Morris Agency. Springer spoke with Phil Citron and Katy Rothacker of that agency and in several conversations with the latter discussed the basic financial terms of Franklin's engagement to appear. Several proposals and counter-proposals were exchanged, in each instance relayed by Rothacker to Franklin and then back to Springer. Near the end of February 1984, Rothacker called Springer and informed him that his final proposal was acceptable.

In the interim, Springer had already set about making the necessary arrangements to get the production going. He was in frequent consultation with Franklin concerning artistic and production matters, although he negotiated the financial terms of the agreement strictly through her agents. During a conversation about rehearsal and performance dates, Franklin indicated to Springer that there were no other conflicting engagements on her schedule, stating: "This is what I am doing."

After consulting with Franklin, Springer hired George Faison as director-choreographer. In the second week of March, Springer and Faison flew to Detroit to meet with Franklin to discuss various aspects of the production, including rehearsal and performance dates. Franklin agreed on a tentative schedule that called for rehearsals to begin in April and performances to begin in May.

After returning to New York, Springer began negotiating limited partnership

1. The trial was bifurcated, only liability having been at issue.

2. Franklin did not attend the trial. No medical testimony or other evidence was presented to explain her absence. We admit her deposition into evidence over plaintiff's objection, but review of it has not altered our views.

3. Plaintiff conceded for the purposes of motions made earlier in this case that Elvin Associates is merely a d/b/a name for Springer, and Springer's testimony at trial did not disavow that concession. We shall therefore refer to plaintiff as "Springer."

4. The two had several years earlier discussed such a project, but for reasons not relevant to this case it did not advance beyond the conceptual stage.

agreements with various investors to finance the "Mahalia" production. He also began calling promoters and theaters in various cities in an effort to reserve dates for performances. During discussions with several promoters he learned for the first time that Franklin had recently cancelled several performances, purportedly due to a newly acquired fear of flying. Springer spoke with Citron at William Morris regarding these incidents, and the latter stated that the cancellations resulted from commitments made by prior agents for Franklin without her approval, and reassured Springer that there was no such problem here. Springer also spoke with Franklin, who reassured him that she wanted to do the show and that she would fly as necessary. Springer offered to make alternative arrangements for transportation to the various performance sites, and to alter the performance schedule to accommodate slower forms of transportation. Franklin told Springer that she was uncomfortable traveling more than 200 miles per day by ground transportation, but strongly assured him that she would overcome her fear of flying.

Springer had also in the interim contacted Jay Kramer, his attorney, about the proposed production and the terms he had discussed with Franklin's representatives. Kramer set up a meeting for March 23, 1984 with Franklin's representatives for the purpose of finalizing the agreement. Present at the meeting on that date were Springer, Kramer, Citron, Rothacker, Greg Pulis (an attorney at William Morris) and Andrew Feinman (Franklin's attorney). The basic financial terms that had been previously agreed upon in the Springer–Rothacker conversations were confirmed: Franklin would be paid $40,000 per week in salary, and an additional weekly amount to cover her expenses ($5000 per week while in New York; $4500 per week outside of New York). In addition, she would receive 15% of the show's gross weekly revenues exceeding $225,000 (the "break even point"), and 20% of the show's weekly profits. In return, she would commit herself to 12 weeks of performances. Springer and Kramer asked Franklin's representatives to call her and obtain her approval of these terms. The Franklin team left the meeting room, and shortly returned indicating that she had agreed to them. The only major issue left unresolved at the close of this meeting was the location for rehearsals, Franklin's representatives having requested that they be in Detroit. Faison subsequently vetoed this proposal, stressing that the lighting and costume designers that were to be engaged were all in New York. Springer did not convey this information directly to Franklin, but she ultimately learned through her agents that the rehearsals would take place in New York.

After the March 23 meeting, Kramer drafted a contract in the form of a letter to defendant Crown Productions, Inc., the corporation through which Franklin's services were to be furnished. Crown Productions was to be the primary obligor (and obligee) under the contract, and Franklin was personally to guarantee Crown's performance.

Before drafting the contract, Kramer had obtained from William Morris a copy of a "Domestic Rider" containing various required terms for all engagement contracts involving Franklin. Among the terms listed in the rider was: "This contract/agreement shall not be deemed valid until executed by ARTIST." At the bottom of the rider was the admonition "DO NOT DEVIATE." Kramer reviewed the rider to determine which terms were appropriate for inclusion in the draft. He did not include in the first draft the term concerning validity upon execution. As he testified: "It was impractical. We were underway. From the moment we left that room, given the schedule that we outlined Mr. Springer was well on his way to making financial commitment based on the understanding we thought we had reached." Franklin's representatives never suggested that the term be inserted in any of the subsequent drafts. However, every draft began with the sentence: "This letter [addressed to Crown Productions, Inc.], when countersigned by you, shall constitute our understanding until a more formal agreement is prepared."

In the ensuing weeks a series of drafts circulated between the principals and their various agents. The basic pattern was that Kramer would first send a new draft to Springer for his approval, and would then send it to Citron, Feinman and Pulis, who would return it marked up with their comments. Franklin reviewed at least some of these drafts, but could not identify any of them with certainty as having been reviewed by her.

Of the various changes made in the successive drafts, with or without intervening oral negotiation, all concerned relatively minor points. Other than a $15,000 increase in the "break even point" of gross weekly receipts, accompanied by a minor increase in the expense allowances, there were no changes in the material financial terms of the agreement reached on March 23. Although the first draft provided for rehearsals to begin in April and performances to begin in May, and did not specify a rehearsal location, the first revised draft provided for rehearsals to begin in June in New York City. Most notable of the incidental points that were negotiated through the circulation of the drafts was the means by which Franklin's representatives would verify that Crown was being paid its due percentage of the show's revenues; Springer would not agree to give them physical access to the box office, but did agree to provide financial statements that would be subject to an audit. Neither this nor any other issue emerged as a potential "deal-breaker." A final draft of the contract was ready for signature as of June 7, the date that Franklin was scheduled to come to New York to begin rehearsals for the show.

Springer had in the intervening weeks made all of the arrangements necessary for rehearsals to begin. He had hired set, lighting and costume designers, stage and technical crew, and had reserved dance studios. Springer was in frequent communication with Franklin during this period, as were Faison and other members of the production staff, concerning such varied matters as the compositions to be performed, the costumes she would wear, and the hiring of her own regular backup singers to be in the chorus. At one point, Franklin sang one of the production songs to Springer over the telephone. At some point during this period, Faison made final determinations as to the compositions to be performed and as to the cast and chorus.

As planned, rehearsals actually began on June 4 without Franklin, and continued for several days. Franklin did not arrive in New York on June 7 and, indeed, never came to New York for the rehearsals. Kramer immediately sought an explanation from Franklin's representatives and was informed that she would not fly. Springer paid the cast through the end of that week, but then suspended the production. He attempted to secure some other well-known performer to fill the title role, but none of the performers whom he contacted would agree to step into the role at that juncture.

On July 18, after having positive discussions with Les Matthews, a Texas financier who purported to be interested in backing the production, Springer wrote to Franklin with a proposal to revive it, whereby rehearsals and opening performances would take place in Detroit, with Franklin covering the excess expense caused by such an arrangement. The terms of Franklin's profit-sharing would be altered to account for the losses and additional costs caused by the suspended production. In August Franklin agreed to sign a draft agreement (doing so only on behalf of Crown Productions) so that Springer could regain some of his lost credibility with potential investors. Franklin's attorney held the signed draft in escrow, release from which was expressly conditioned on Springer's finalization of a performance schedule.

A final performance schedule was never arranged. One of the difficulties Springer encountered was that, due to the collapse of the earlier production, theaters and concert halls were now requiring substantial deposits to reserve particular dates. Springer lacked the capital to make those deposits. Matthews failed to appear for the scheduled closing of the investment agreement in early September, and Springer was unable to obtain any other financing for the production. He ultimately aban-

doned this second attempt at mounting the "Mahalia" production.

This lawsuit ensued, with Springer (suing in the name of Elvin Associates) alleging breach of the original agreement to appear in "Mahalia," and Franklin counterclaiming for breach of the second agreement concerning the proposed Detroit-based production. In his pre-trial memorandum, Springer asserted an alternative right to recover on a theory of promissory estoppel.[5]

## DISCUSSION

■ The central issue pertaining to plaintiff's claim for breach of contract is whether or not the parties to that proposed contract, i.e. Springer, Crown Productions, Inc., and Franklin in her capacity as guarantor of Crown's performance, evinced an intent not to be formally bound before execution of a written, integrated contract. Language inserted in a draft of the agreement referring to its validity upon execution has generally been found to be strong (though not conclusive) evidence of intent *not* to be bound prior to execution. *R. G. Group v. Horn & Hardart* (2nd Cir.1984) 751 F.2d 69, 75; *Reprosystem, B. V. v. SCM Corp.* (2nd Cir.1984) 727 F.2d 257, 262. Although we based our tentative findings largely on the fact that all of the incidental terms had been worked out by the final draft, and that the understanding was that Franklin would sign the agreement when she came to New York, there remains the obstacle of the preamble that Kramer drafted and that remained in every draft, namely: "This letter, when countersigned by you, shall constitute our understanding until a more formal agreement is prepared." After reviewing the above cited authorities and the post-trial submissions, we are constrained to find that such lan-

guage indicates that Crown Productions, Inc. was not to be contractually bound to Springer until the draft agreement was executed. This clause is simply too close to the language held to be decisive in *Reprosystem, supra,* to be ignored. The cause of action for breach of contract must therefore be dismissed as against both defendants, as the absence of direct contractual liability on Crown's part eliminates any possible basis for Franklin's derivative liability as Crown's surety.[6]

That, however, does not end the case. As above noted, plaintiff has asserted, in the alternative, a right to recover on a theory of promissory estoppel. The elements of a claim for promissory estoppel are: "[A] clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Reprosystem, supra,* at 264 (*quoting Ripple's of Clearview v. Le Havre Associates* 88 A.D.2d 120, 452 N.Y.S.2d 447, 449). The " 'circumstances [must be] such as to render it *unconscionable* to deny' the promise upon which plaintiff has relied." *Philo Smith & Co., Inc. v. USLIFE Corporation* (2nd Cir.1977) 554 F.2d 34, 36 (*quoting* Williston on Contracts § 533A, at 801 (3d ed. 1960) (emphasis the court's)).

■ It is difficult to imagine a more fitting case for applying the above-described doctrine. Although for her own business purposes Franklin insisted that the formal contract be with the corporate entity through which her services were to be "furnished," in the real world the agreement was with her, and we find that she had unequivocally and intentionally committed herself to appear in the production long before day on which it was intended

---

5. Defendants have objected to the assertion of a new theory of recovery not previously pleaded. To the extent an amendment of the pleadings is a necessary prerequisite to entitlement to equitable relief, we will construe plaintiff's assertion of the promissory estoppel theory, which was reiterated in his post-trial submission, as a motion to conform the pleadings to the proof pursuant to Fed.R.Civ.P. 15(b). As so construed, the motion is granted.

6. This eliminates the necessity of reaching defendant's contentions that the Statute of Frauds bars enforceability of Franklin's guarantee in the absence of a signed writing, and that the alleged agreement for the Detroit-based production constituted a novation of the earlier agreement, thereby discharging any breach.

that the finalized agreement with her corporation would be signed.[7]

First, it is clear from the testimony of all of the witnesses that Franklin was enthusiastic about appearing in the production and that at all times during the relevant period gave it the highest professional priority. She early on stated to Springer: "This is what I am doing." Combined with her oral agreement, through her agents, to the basic financial terms of her engagement, her continued expression of this enthusiasm to Springer more than amply afforded Springer a reasonable basis for beginning to make the various arrangements and expenditures necessary to bring the production to fruition.

Second, Franklin could not possibly have assumed that Springer could have performed his obligations to her—which, among other things, included arranging a complicated schedule of performances to commence shortly after her arrival in New York—without committing himself to and actually spending considerable sums prior to her affixing her signature to the contract on the date of such arrival. Throughout the time that he was making those commitments and advancing the necessary sums, she accepted his performance without any disclaimer of her prior promises to him. Indeed, she actively participated in many aspects of the necessary arrangements.

Third, Franklin's expression to Springer of her fear of flying did not, as she has contended, make her promise conditional or coat it with a patina of ambiguity that should have alerted Springer to suspend his efforts to mount the production. Although Franklin rejected Springer's offer to make alternative ground transportation arrangements, her primary reason for doing so was that she was determined to overcome her fear of flying, and it was reasonable for Springer to rely on her reassurances that she would be able to fly. Moreover, it was also entirely reasonable for him to assume that if she could not overcome her fear she would travel to New York by other means, even if it meant spreading the trip over several days. In short, Franklin's fear of flying provides no basis whatsoever for avoiding liability for failing to fulfill her promise, reiterated on several occasions, to appear in "Mahalia." If she could not bring herself to fly, she should have traveled by way of ground transportation. It has not been established that she was otherwise unable to come to New York to meet her obligations.

We conclude that under the circumstances as we have outlined them it would be unconscionable not to compensate Springer for the losses he incurred through his entirely justified reliance on Franklin's oral promises. A determination of the exact amount to be awarded has been reserved for a later trial on damages.

■ Turning to defendants' counterclaim concerning the second, Detroit-based production of "Mahalia," we dismiss this claim for the reasons we stated at the close of the trial, namely, that the only reasonable view of the facts is that any obligation on Springer's part was conditional on his obtaining financial backing for the revival of the production. The whole tenor of Springer's letter to Franklin of July 18 was one of contingency, based upon securing new and greater amounts from investors. Franklin cannot have been oblivious to the dire financial situation in which her failure to come to New York had placed Springer, and cannot reasonably have believed that he was committing himself unconditionally to the financial obligations attendant to reviving the production without first obtaining adequate capitalization. Although the parties did not express such a condition

---

7. Allowing Springer to recover against Franklin on a theory of promissory estoppel is not inconsistent with our dismissal of the claim for breach of contract against Crown Productions, Inc. (and of necessity against Franklin as Crown's surety). Although the Court of Appeals has suggested that a finding of intent not to be bound before execution renders that party's oral promise too ambiguous to support a theory of promissory estoppel, see *Reprosystem, supra,* at 265, we are dealing here, at defendants' insistence, with two separate entities, Crown and Franklin. We see nothing in the unavailability of a legal remedy against the former that bars equitable relief against the latter.

in so many words, they accomplished the same result by providing that the contract would not be released from escrow until the schedule of performances had been finally arranged, which in the nature of things would not occur until financing was in place.

In sum, we find that this agreement contained an implied condition that Springer would be able to obtain sufficient financial backing to mount the production, and that his inability to satisfy such a condition despite his best efforts released him from any liability under the agreement.

Defendant has made much of Springer's "admission" at his deposition that he "guess[ed]" he was "bound" by the Detroit-based contract. In the first place, this is not an admission of fact but the legal conclusion of a layman, which we find to have been erroneous. Second, even if we were to treat it as an admission that he had given assent to the agreement in a binding fashion, such an admission would not vitiate the effect of the implied condition which we have found to be supported by all of the other evidence, including Springer's trial testimony.

There is no basis for a claim against Springer for breach of contract, and the counterclaim is dismissed.

## CONCLUSION

The foregoing shall constitute our findings of fact and conclusions of law with respect to liability. Plaintiff's cause of action for breach of contract is dismissed, but he shall recover against defendant Franklin on the basis of promissory estoppel. Defendants' counter-claim for breach of contract is dismissed. Counsel shall appear for a conference on February 22, 1989 at 4:30 p.m. in Courtroom 619 to discuss the fixation of the amount of damages.

SO ORDERED.

## OPINION ON DAMAGES

This action arose out of defendant Aretha Franklin's failure to appear for rehearsals of a Broadway musical production based on the life and music of Mahalia Jackson. After a bench trial on the issue of liability, we found for plaintiff,[1] the producer of that show, on a theory of promissory estoppel. We then referred the case to Magistrate Nina Gershon for trial on the issue of damages.

In an extremely thorough report, Magistrate Gershon recommended that plaintiff be awarded out of pocket expenditures totaling $52,182.12 with interest thereon from June 20, 1984, and various unpaid debts totaling $182,181.95. We have reviewed *de novo* those portions of the Magistrate's report to which the parties have objected, and, for reasons which follow, we accept her recommendations in every respect but one: we find that plaintiff failed to meet his burden with respect to the alleged debt to Tait Towers Lighting, Inc., and therefore exclude it from his damages award.

The underlying facts of this case have been set forth in both our Memorandum and Order of February 2, 1989 and in the Magistrate's report. This memorandum and order assumes familiarity with both, and sets forth only those facts necessary to permit the parties to understand our resolution of the issues raised by their objections.

## DISCUSSION

### I.  *Defendant's Objections*

Defendant contends: (a) that plaintiff failed to meet his burden of proof with respect to several of the unpaid debts awarded by the Magistrate; and (b) that plaintiff's award should be reduced by the $30,000 he received in settlement of his claim against producers of a subsequent theatrical production similar in concept to his own aborted endeavor.

### (a)  *Unpaid Debts*

Tait Towers Lighting, Inc.

■ Pursuant to a contract dated May 21, 1984 (Ex. 35), Tait Towers Lighting

---

**1.** As noted in our Memorandum & Order of February 2, 1989, Elvin Associates is merely a d/b/a name for its principal, Ashton Springer, whom we shall refer to here as plaintiff.

("Tait") was retained by plaintiff to construct the show's sets for a fee of $25,000. The contract required an "earnest money deposit" of $12,500 upon signing, and payment of the remaining $12,500 upon the sets' completion and prior to their delivery. Plaintiff sent Tait his personal check for the $12,500 initial deposit. That check, however, was dishonored and was never made good. Thereafter, Tait wrote at least one letter to plaintiff's attorney demanding that the check be honored and threatening criminal prosecution. There is, however, no suggestion that Tait took any formal action to pursue a claim on the contract. Beyond plaintiff's testimony that he had been so informed (Tr. 376), there is nothing in the record to suggest that the sets were ever completed.

We agree that plaintiff has failed to meet his burden of establishing this debt. Although it might be quite possible that, even after learning that plaintiff's check had been dishonored, Tait continued to construct the sets, we cannot say that it is more likely than not that such would have been the case. Indeed, it appears more probable that a contractor who initially required earnest money before beginning work would not proceed after discovering that it unknowingly had been working "on spec". Tait's inaction over the five years that this litigation has been pending further supports an inference that no debt is owing. Accordingly, we depart from the Magistrate's recommendation and deny plaintiff recovery for the alleged debt to Tait.

### Craft Clerical Clothes

■ Defendant contends that plaintiff failed to establish his alleged debt to Craft Clerical Clothes ("Craft"), from which he had ordered custom-made stoles and choir robes to be used as costumes for the production. As evidenced by a check stub dated June 4, 1984 (Ex. 5A), plaintiff made a $1,000 down payment. Three weeks later, on June 28, Craft mailed an invoice (Ex. 44), apparently issued in the normal course of business, for the total price of $5901.60. Accordingly, plaintiff asserts that it owes Craft $4901.60.

Based on the foregoing, we conclude that plaintiff sufficiently proved this debt. The evidence is fully consistent with the inference that the robes were completed. Although Craft may have been able to resell the robes and thereby reduce its loss, as Magistrate Gershon properly concluded, the burden of proving such mitigation is on the defendant, who here "sought no discovery ... and offered no evidence ... to support her speculation that such mitigation occurred." Report, p. 24.

In addition, we reject defendant's contention that plaintiff should be denied recovery for this debt because Craft's claim against plaintiff may now be time-barred under the Uniform Commercial Code. Such a contention is disturbing where, as here, the limitations period, if applicable, expired during the course of this protracted litigation. The fact that plaintiff, through luck or negotiation, successfully staved off Craft pending the outcome of this litigation should not accrue to the benefit of the defendant by precluding recovery of the unpaid debt which may enable plaintiff, at least in part, to restore his professional integrity.

### Theatre Management Associates

■ We reject defendant's contention that the compensation provisions contained in the agreement (Exh. 43) between Theatre Management Associates, Inc. ("TMA") and plaintiff "without ambiguity or equivocation expressly limited TMA's fee to the initial 'production fee' of $12,500." Def. Objections, p. 10.

Paragraph 5 of the agreement (with emphasis added) provides as follows:

5. In consideration of the services of the General Manager as hereinabove described, the Producer [plaintiff] shall compensate the General Manager [TMA] as follows:

A. Pay to the General Manager as a **production fee** of $12,500; one third of which shall be payable upon the signing of this agreement, and the remainder due upon the completion of the financing of the Production but in no event later than eight weeks prior to the first day of rehearsal. It is specifically understood

that it financing is not completed by Producer and the project terminated no additional money shall be due us.

B. Pay to the General Manager a **weekly fee** of $1,250 commencing two weeks prior to the first week of rehearsal and continuing throughout the entire run of the production until two weeks past closing. The weekly fee shall be increased by 15% commencing one year after the first paid public performance of the Production.

C. Pay to the General Manager **2% of 100% of the Net Profits** of the production company as described in the Limited Partnership Agreement for the company after recoupment as provided under the Partnership Agreement.

Defendant would have us construe the last sentence of subparagraph (A) without regard to the structure of paragraph 5 as a whole. The paragraph plainly contemplates three kinds of compensation: a production fee (sub-¶ (A)), a weekly fee (sub-¶ (B)), and a profits percentage (sub-¶ (C)). We conclude that the limitation contained in the last sentence of subparagraph (A) applies only to payment of the production fee, the compensation which that subparagraph addresses. Accordingly, we agree with the Magistrate's conclusion that plaintiff is entitled to recover not only $12,500 for TMA's "production fee," but also the $8,750 owed TMA for seven weeks of services.

John Simmons

■ Defendant contends that the Magistrate improperly concluded that Simmons had completed all that he was required to do under his contract with the plaintiff. Therefore, defendant asserts, plaintiff should not recover the full contract fee. We disagree. Pursuant to paragraph 1 of his contract (Ex. 40), Simmons was obligated to write orchestrations for the production and, in so doing, to devote such time until the New York opening "as may be required by the Employer." In essence, defendant contends that, although Simmons completed the orchestrations, plaintiff should not recover the full contract price because Simmons was not required to perform services throughout the period during which he *could* have been required to do so. As Magistrate Gershon noted, however, "there is no evidence that more [than the orchestrations] was required as a condition precedent to full payment." Report, p. 14. We similarly reject defendant's contention that the "payment schedule" set forth in paragraph 2 is at odds with recovery of the full price of Simmons' contract. Although paragraph 2 provides that $2,000 of the $5,000 fee would be payable the week of the show's first opening, it does not condition plaintiff's liability for that payment on such opening.

George Faison

■ Defendant does not dispute that plaintiff incurred the following unpaid debts to his collaborator and choreographer-director, George Faison: an $8,000 loan for cast salaries, $7,587 for five weeks' services, and $498 to be reimbursed for rehearsal space rental. Instead, defendant contends that these debts should not be awarded because "any debt to Mr. Faison was offset by [plaintiff's] substantial claim against Mr. Faison for conversion." This contention lacks merit. As noted *infra*, we agree with the Magistrate that plaintiff's claim against Faison concerned injury suffered as an author, and not as a producer. Thus, plaintiff's damages in the form of debts to Faison are recoverable in this action irrespective of plaintiff's claim against Faison.

Debts to Potential Investors

■ We reject defendant's contention that the Magistrate erred in awarding to plaintiff $72,155 as unpaid debts owed to the Nederlander Organization and to Meyer & Friedman. In her papers, defendant invites us to view these entities as limited partners who risked and lost their moneys in a failed business venture, *i.e.* the production. Def. Objections, p. 19. Upon reviewing the record, however, we agree with the Magistrate that the suggestion that these two entities should be considered limited partners is contrary to the weight of the evidence. Indeed, as defendant concedes,

although a limited partnership agreement was discussed and drafted, it was never executed.

### (b) *Mitigation*

■■■ The Magistrate properly declined to reduce the amount of plaintiff's damages by the $30,000 he received in settlement of his claim against the producers of a subsequent theatrical production based on the life and music of Mahalia Jackson. There is no basis for defendant's contention that "but for" defendant's failure to appear plaintiff would have had nothing to sell. As the Magistrate found, plaintiff received the moneys in exchange for authorship rights, and not, as defendant suggests, for his interest as producer. In short, the authorship rights existed independently of the defendant's failure to appear and did not flow therefrom. Although, as plaintiff conceded on cross-examination, defendant's appearance in the production probably would have exhausted the show's immediate Broadway market (Tr. 548), there is no evidence to suggest that plaintiff would have been unable at some later time to sell, license or otherwise profit from the property.[2] Accordingly, the Magistrate properly concluded that the $30,000 payment should not be treated as mitigation.

### II. *Plaintiff's Objection*

Plaintiff objects only to the Magistrate's denial of pre-judgment interest on the amount of the award attributable to unpaid debts. We agree with the Magistrate that an award of such pre-judgment interest would be inconsistent with the compensatory purpose of N.Y.C.P.L.R. § 5001(a) in view of the complete lack of evidence that plaintiff will be required to pay interest on any of these debts.

### CONCLUSION

In light of the foregoing, we adopt the Magistrate's recommendations in their en-

tirety except that plaintiff shall not recover for the alleged debt to Tait Towers Lighting. Accordingly, we direct the clerk to enter judgment for plaintiff in the amount of $209,364.07, with pre-judgment interest from June 20, 1984 only on the sum of $52,182.12.

SO ORDERED.

---

**2.** Notwithstanding the successful 1985 production which starred Jennifer Holliday, the life and music of Mahalia Jackson appear still to provide the subject matter for marketable theatrical ventures. We observe that, while the ob-

jections addressed herein were *sub judice,* a production entitled "Truly Blessed: A Musical Celebration of Mahalia Jackson" opened and continues to run at Broadway's Longacre Theatre.