**INDIANA HI–RAIL CORPORATION,**
Plaintiff,

v.

**CSX TRANSPORTATION,**
**INC., Defendant.**

**No. IP 91–165–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 30, 1993.

James Hughes, Sommer & Barnard, Indianapolis, for plaintiff.

G. Paul Moates, Vincent F. Prada, Sidley & Austin, Washington, D.C., Lee B. McTurnan, McTurnan & Turner, Indianapolis, for defendant.

## MEMORANDUM ENTRY

BARKER, District Judge.

### I.  *Factual Background*

For purposes of the defendant's Motion to Dismiss, the facts alleged in the plaintiff's Complaint are undisputed.  The plaintiff, Indiana Hi–Rail Corporation (hereinafter "Indiana Hi–Rail"), is an Indiana corporation. *Complaint*, p. 2, ¶ 4.  Indiana Hi–Rail is a freight-hauling railroad which provides service over approximately four hundred miles of noncontiguous railroad lines in Indiana,

Ohio, Illinois and Kentucky. *Id.; Plaintiff's Memorandum in Opposition to Motion to Dismiss* (hereinafter "Plaintiff's Memorandum"), p. 3. The defendant, CSX Transportation, Inc. (hereinafter "CSXT"), is a wholly-owned subsidiary of CSX Corporation, which is incorporated in the State of Virginia. *Id.,* at ¶ 5. CSXT is also a freight-hauling railroad. It operates a 19,000 mile system in twenty states (including Indiana), the District of Columbia, and in the Canadian province of Ontario. *Id.*

On March 29, 1989, the parties entered into a Purchase and Sale agreement (hereinafter *"Letter Agreement "*). *Complaint,* p. 2, ¶ 6. CSXT agreed to sell Indiana Hi–Rail 47.14 miles of the CSXT railroad line which runs from Milepost 66.4 in Richmond, Indiana, to Milepost 19.0 in Fernald, Ohio. *Id.* The railroad line is situated in Wayne and Union counties, Indiana, and Butler and Hamilton counties, Ohio. *Id.* The parties' Letter Agreement included a provision which stated that the three million dollar ($3,000,-000.00) purchase price would be paid over a twenty year period, and indicated that the parties would jointly seek approval of the proposed transaction by the Interstate Commerce Commission. *Id.,* at p. 2, ¶ 7; p. 3, ¶ 8.

Significantly, the Letter Agreement also contained provisions pertaining to contract termination and the parties' closing date. These provisions provided, in pertinent part, as follows:

18. *Termination*—In addition to CSXT's right of termination pursuant to Section 10 hereof, *this Agreement may be terminated prior to the Closing Date by either IHRC or CSXT, without further liability or obligation to either of them, in the event* of any of the following: ... (c) *the Closing has not occurred on or before August 31, 1989, for any reason,* including a stay of the ICC's orders or the issuance of an injunction prohibiting the consummation of the transactions contemplated herein[.]

   \*    \*    \*    \*    \*    \*

19. *Closing*—Subject to the rights of termination provided in this Agreement, the Closing under this Agreement shall be held at a mutually agreeable location on a mutually agreeable Closing Date on or before August 31, 1989....

*Letter Agreement of March 30, 1989* (hereinafter "Letter Agreement"), p. 8 (emphasis added).

The parties' Letter Agreement also contained an integration clause which provided, in pertinent part, as follows:

20. *Entire Agreement, Waivers and Expenses*—This offer when accepted by IHRC shall constitute the entire agreement between IHRC and CSXT and supersedes all other prior understandings and agreements, both written and oral, between or among IHRC and CSXT with respect to the subject matter of this Agreement. *This Agreement may be supplemented, amended or modified at any time and in any and all respects only by an instrument in writing executed by IHRC and CSXT....* Time is of the essence of this Agreement.

*Letter Agreement,* p. 9 (emphasis added).

On March 30, 1989, Indiana Hi–Rail's President, R. Powell Felix signed the Letter Agreement under the legend "ACCEPTED AND AGREED TO[.]" *Letter Agreement,* p. 10. Although CSXT Assistant Vice President Dale R. Hawk did not date the Agreement when he signed it, he presumably signed it the preceding day. *Id.*

On November 8, 1989, after the closing date established by the Letter Agreement had passed, the parties entered into an "Amendment to Purchase and Sale Agreement." *Amendment to Purchase and Sale Agreement* (hereinafter "First Amendment"), p. 3. The Amendment stated that certain events beyond the parties' control (*e.g.,* delay in obtaining Interstate Commerce Commission approval of their transaction) had "resulted in a delay in the consummation of the transactions contemplated in the Agreement," and that the parties believed it to be "in their mutual best interes[t] to amend the Agreement with respect to the amount of the deposit *and the proposed closing date."* *First Amendment,* p. 1, ¶¶ 3–4 (emphasis added). The First Amendment deleted in its entirety Section 18 of the Letter Agreement, and added a revised Section 18 which (1) permitted termination of the Agreement if

for any reason closing did not occur *by March 31, 1990*, and (2) included a new subsection (subsection (f)) which provided that the Letter Agreement could also be terminated without further liability or obligation to either party if *"CSXT, in its sole discretion,* determines that the federal income tax consequence of the installment sale contemplated hereby is unacceptable to it." *Id.*, p. 2–3, ¶ 5 (emphasis added). The First Amendment also revised Section 19 of the Letter Agreement by substituting March 31, 1990, for the closing date that had been established by the Letter Agreement. *Id.*, p. 3, ¶ 6.

On August 17, 1990 (*after* the new closing date had passed), CSXT Director of Shortline Projects–Asset Management M.L. Jameson sent a letter to Indiana Hi–Rail President Felix stating that Indiana Hi–Rail should execute the enclosed originals of the proposed "Second Amendment to Purchase and Sale Agreement," and *"return them to [Jameson] for CSXT execution." Letter of August 17, 1990* (emphasis added). Jameson indicated that, following execution by CSXT, "one of the fully signed originals w[ould] be returned for [Indiana Hi–Rail's] file." *Id.*

The draft of the proposed Second Amendment which accompanied Jameson's August 17, 1990 letter differed from the June 11 and July 9, 1990 drafts of the proposed Second Amendment in that the earlier drafts contained the following notation, in bold face type, at the top of the page:

THIS IS A DRAFT DOCUMENT FOR DISCUSSION PURPOSES ONLY[:] THIS DRAFT DOES NOT CONSTITUTE A BINDING OFFER UNLESS IT IS SIGNED BY AN AUTHORIZED OFFICER OF CSX RAIL TRANSPORT.

*Attachment 1 to Plaintiff's Memorandum in Opposition to Motion to Dismiss*, p. 1; *Attachment 2 to Plaintiff's Memorandum in Opposition to Motion to Dismiss*, p. 1. This legend, which would obviously have been inappropriate in a fully executed contract, was deleted from the draft which accompanied Jameson's August 17, 1990 letter.

The proposed Second Amendment, which would have amended the parties' Letter Agreement "with respect to the personal property to be included, the Purchase Price, and [once again] the proposed closing date," contained a blank for its date of execution.

*Proposed Second Amendment*, p. 1. The proposed Second Amendment would have substituted January 31, 1991, for the March 31, 1990 closing date which went into effect when the First Amendment was executed. *Proposed Second Amendment*, p. 3, ¶¶ 3–4.

Indiana Hi–Rail President Felix signed both originals of the proposed Second Amendment and returned the same back to Jameson. Rather than mailing a fully executed copy of the Second Amendment to Felix, however, which would have indicated that the parties' agreement remained on track, CSXT sent a fax to Felix which stated that CSXT was *"not* prepared at this time to execute the Second Amendment, which would have extended the termination of the line sale agreement until January 31, 1991." *Letter of October 24, 1990* (emphasis added). The letter recited in detail the reasons underlying CSXT's decision, including its belief that its relationship with Indiana Hi–Rail had "become increasingly confrontational." CSXT indicated that while it would be undertaking a "complete review of the likely postsale operating and commercial environment," it was deferring any decision regarding the sale pending the completion of such review. *Id.*, pp. 1–2.

By letter dated October 29, 1990, Indiana Hi–Rail President Felix related that he had been "greatly taken aback by CSXT's letter of October 24, 1990." *Letter of October 29, 1990*, p. 1. Stating that Jameson had "personally reassured" him of CSXT's commitment to "an expeditious closing once the arbitration decision was at hand," and that it was his opinion that Indiana Hi–Rail's relationship with CSXT was improving rather than deteriorating, Felix described CSXT's letter of October 24, 1990, as "an absolute about face on all previous communications in reference to the Richmond to Fernald [line]." *Id.*, at 3. Felix suggested that the parties close promptly, concluding his letter as follows:

There is no question in my mind that we still have a deal with CSXT. *The Second Amendment is quite valid and is in effect.* Further delay at this time would be in clear violation of CSXT's obligations under our contract, and IHRC will hold CSXT

responsible for any costs and losses it may incur as a result.

*Id.*, at 4 (emphasis added).

On November 9, 1990, Jameson sent another fax to Felix in response to his letter of October 29, 1990. Jameson stated therein it was CSXT's opinion that it would *not* be breaching the parties' Agreement if it did not proceed with the sale because the Agreement had expired per the parties' First Amendment in March of 1990. *Letter of November 9, 1990,* p. 1. In order to complete CSXT's financial evaluation of Indiana Hi–Rail, Jameson requested certain Indiana Hi–Rail financial documents, among them Indiana Hi–Rail's 1989 audited consolidated financial statements. *Id.*, at 2. Jameson also suggested a joint meeting in Jacksonville, Florida. *Id.*

On December 14, 1990, Jameson sent an additional fax to Felix, stating that CSXT had concluded its investigation and that based upon CSXT Treasurer A.B. Aftoora's written recommendation (which it included) CSXT declined to finance the proposed line sale unless Indiana Hi–Rail could provide an additional basis of financing. *Letter of December 14, 1990,* p. 1. CSXT Treasurer Aftoora had characterized Indiana Hi–Rail as "very weak financially, totally dependent on the willingness of its bank creditors to continue funding, and vulnerable to a downturn in the economy." *Aftoora Letter of December 13, 1990,* p. 1.

Felix responded by sending yet another letter to CSXT. Felix took issue with Aftoora's assessment of Indiana Hi–Rail's financial condition and attempted to rebut the specific findings upon which the same was based. *Letter of December 18, 1990,* pp. 1–4.

On January 14, 1991, Indiana Hi–Rail's counsel sent a letter to CSXT, in which he reiterated his client's willingness and ability to consummate the sale of the line and "formally to demand that CSXT schedule a Closing no later than January 2, 199[1]." *Letter of January 14, 1991,* p. 1. Allen stated that Indiana Hi–Rail would file suit based upon

CSXT's breach of contract if CSXT did not go forward with the sale. *Id.*, at 2.

The parties' negotiations reached the end of the line on January 29, 1991, when CSXT Assistant Vice President James T. Derwin mailed a letter to Felix indicating that CSXT was unwilling to proceed with the proposed sale. *Letter of January 29, 1991,* p. 1. Referencing Section (18)(f) of the parties' Letter Agreement, which Derwin described as "[t]he termination provision *now in effect*" (the same having been added by the *First* Amendment), the letter stated:

> While CSXT has remained agreeable to going forward with this sale if IHRC can arrange other financing, we are now convinced absolutely that the information we have recently acquired about IHRC's financial condition makes it very likely that CSXT will incur substantial adverse income tax effects if it proceeds to finance this transaction. Since CSXT never has been willing to assume that kind of risk in this deal, I have no choice but to advise you that CSXT has determined the federal income tax consequence of the installment sale contemplated by our contract is unacceptable to CSXT. Accordingly, CSXT is exercising its right to terminate the contract, effective immediately.

*Letter of January 29, 1991,* p. 1 (emphasis added).

On February 13, 1991, Indiana Hi–Rail filed its Complaint alleging that CSXT breached the parties' contract. Relying upon the proposed Second Amendment, Indiana Hi–Rail suggests in its Complaint that CSXT's breach was without legal justification. *Complaint,* p. 11, ¶¶ 41–42. CSXT has since filed its Motion to Dismiss.[1]

## II. *Discussion and Decision*

### A. Jurisdiction

The first issue which must be resolved is whether the Court has jurisdiction over the parties' dispute. Diversity jurisdiction exists where a dispute exists between citizens of

---

1. The Court has reviewed the parties' submissions to date, and concludes that the defendant's Motion for Oral Argument should be denied. Given the fact that this cause has been ably briefed by counsel, the Court is of the view that oral argument would not "substantially contribute to the resolution of [the defendant's Motion]." *Estate of Woll v. United States,* 809 F.Supp. 643, 645 (S.D.Ind.1992).

different states and the amount in controversy exceeds $50,000. *See* 28 U.S.C. § 1332(a)(1) (1988).

■ Plaintiff Indiana Hi–Rail is incorporated under the laws of, and has its principal place of business in, the State of Indiana. *Complaint*, p. 2, ¶ 4. Defendant CSXT is incorporated under the laws of the State of Virginia and has its principal place of business in the State of Florida. *Id.*, at ¶ 5. The diverse citizenship requirement is therefore satisfied. *Galva Foundry Co. v. Heiden*, 924 F.2d 729–730 (7th Cir.1991); *Halmos v. Pan American World Airways, Inc.*, 727 F.Supp. 122, 124 (S.D.N.Y.1989) (*citing Strawbridge v. Curtiss*, 7 U.S. (Cranch) 267, 2 L.Ed. 435 (1806), and 13B Wright, Miller & Cooper, *Federal Practice and Procedure, Jurisdiction 2d*, § 3605, p. 74 (1991 pocket part)).

■ The amount in controversy requirement is also satisfied in this case. The plaintiff seeks approximately $250,000 in damages based upon the defendant's alleged breach of a three million dollar contract. *Complaint*, p. 2, ¶ 7; *Letter of January 14, 1991*, p. 2. The Court has examined the parties' submissions and concludes that it does not "appear to a legal certainty" that the plaintiff's claim is for less than the jurisdictional amount. *Sharp Electronics Corporation v. Copy Plus, Inc.*, 939 F.2d 513, 515 (7th Cir.1991).

**B. Standard of Review**

This matter comes before the Court on the defendant's Motion to Dismiss which was filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Corcoran v. Chicago Park District*, 875 F.2d 609, 611 (7th Cir.1989) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *accord Dawson v. General Motors Corporation*, 977 F.2d 369, 372 (7th Cir.1992) (plaintiff survived dismissal on ground that there

was sufficient ambiguity in alleged offer and acceptance). For purposes of a motion to dismiss, all of the allegations in the plaintiffs' complaint "are assumed to be true." *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263 (1972); *accord Midwest Grinding Company v. Spitz*, 976 F.2d 1016, 1019 (7th Cir.1992).

■ The Court is not required to convert a motion to dismiss into a motion for summary judgment where, as here, documentary exhibits central to the plaintiff's claim(s) are attached to its complaint, or where a defendant attaches documents to its motion to dismiss which are "referred to in the plaintiff's complaint and are central to [its] claim" but which the plaintiff failed to attach. *Venture Associates Corporation v. Zenith Data Systems Corporation*, 987 F.2d 429, 431–32 (7th Cir.1993); *Implement Service, Inc. v. Tecumseh Products Co.*, 726 F.Supp. 1171, 1175–1176 (S.D.Ind.1989).

**C. Enforceability of the Proposed Second Amendment**

The central issue in this case is whether CSXT's refusal to go forward with the line sale, as evidenced by its termination of the parties' Letter Agreement, constituted a breach of contract. Resolution of this issue requires the Court to determine whether the proposed Second Amendment, which would have extended the contract closing date to January 31, 1991, became effective under the circumstances. CSXT argues that under Indiana law [2] the question must be answered in the negative. CSXT further contends that (1) the Court should *not* read into the parties' Letter Agreement an implied obligation of "good faith" because the Agreement expressly permitted unilateral and unconditional termination, and (2) the unexecuted Second Amendment was unenforceable under both the express terms of the parties' Letter Agreement and the Statute of Frauds. *Brief in Support of Motion to Dismiss*, pp. 2–23. According to CSXT, Indiana Hi–Rail is not

---

**2.** CSXT argues that Indiana law, the substantive law of the forum state, applies in this case. *Brief in Support of Motion to Dismiss*, pp. 10–11, n. 6. Given the fact that Indiana Hi–Rail does not suggest otherwise, the Court will apply Indiana

law in resolving the parties' dispute. *See Stenograph Corporation v. Fulkerson*, 972 F.2d 726, 728 (7th Cir.1992) (*citing In re Iowa R. Co.*, 840 F.2d 535, 543 (7th Cir.), *cert. den.* 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988)).

entitled to the relief it seeks because CSXT terminated the parties' Letter Agreement in accordance with the Agreement's terms. *Id.* CSXT also argues that Indiana Hi–Rail's one-sentence promissory estoppel argument is without merit because Indiana Hi–Rail has failed to allege a clear and definite promise by CSXT and reasonable reliance by Indiana Hi–Rail. *Id.,* at p. 2–3.

Plaintiff Indiana Hi–Rail argues, on the other hand, that CSXT breached the parties' Agreement when it notified Indiana Hi–Rail on January 29, 1991 (two days before the January 31, 1991 closing date it contends was fixed by the Second Amendment), that it had decided *not* to proceed with the sale of the line. *Plaintiff's Memorandum,* p. 1. Indiana Hi–Rail argues, based upon conduct on CSXT's part which it suggests "imported its acceptance of or assent to" the Second Amendment, that "the failure of the drafting party to countersign an agreement is immaterial to [the agreement's] legal effectiveness." *Id.,* at 2, 5–13. Furthermore, Indiana Hi–Rail argues that even if the Second Amendment did not become legally effective, CSXT would be liable for breach of contract under the theory of promissory estoppel. *Id.,* at 2–3, 19–21.

■ The Seventh Circuit Court of Appeals recently had occasion to discuss the significance of the parties' intent in contract interpretation:

> In Indiana, as in other jurisdictions, the touchstone of contract interpretation is to determine the parties' intent. *See First Federal Savings Bank of Indiana v. Key Markets, Inc.,* 559 N.E.2d 600, 603 (Ind. 1990); generally 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 538, at 55 & n. 40 (1960). Consistent with the foregoing principle, Indiana courts will enforce an unambiguous contract as written, thereby leaving the parties to the positions for which they have bargained. *See, e.g., First Federal Savings Bank,* 559 N.E.2d at 604; *Martin Rispens & Son v. Hall Farms, Inc.,* 601 N.E.2d 429, 436 (Ind.App.1992).

*Trustees of First Union Real Estate Equity & Mortgage Investments v. Mandell,* 987 F.2d 1286, 1289 (7th Cir.1993) (applying Indiana law). "Respecting the freedom to contract, courts are generally reluctant to interfere with bargained-for agreements between parties. JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 14–31 (1987)." *Woodbridge Place Apartments v. Washington Square Capital, Inc.,* 965 F.2d 1429, 1435 (7th Cir. 1992). When, as in the present case, the parties incorporate language into the documents governing their relationship which clearly indicates their intent not to be bound unless and until they execute a formal written document, such language will generally be given effect by the courts. *State v. Daily Express, Inc.,* 465 N.E.2d 764, 767 (Ind.App. 1984) (parties may agree that the validity of their contract is "dependent upon" their signatures); *Roth v. Garcia Marquez,* 942 F.2d 617, 626–627 (9th Cir.1991) (affirmed dismissal under Rule 12(b)(6), holding that a party's signature was a condition precedent to the formation of a binding agreement) (citations omitted); *Jim Bouton Corporation v. Wm. Wrigley Jr. Co.,* 902 F.2d 1074, 1081 (2d Cir.), *cert. den.* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990) ("[U]ndisputed objective facts demonstrate beyond cavil that the parties did not intend to be bound until 'final papers' or an 'acceptable writing' was prepared and signed."); *U S West Financial Services, Inc. v. Tollman,* 786 F.Supp. 333, 342 (S.D.N.Y.1992) (citations omitted); *Elvin Associates v. Franklin,* 735 F.Supp. 1177, 1182 (S.D.N.Y.1990) (proposed contract between Aretha Franklin's production company and independent producer relating to musical production held not to constitute an enforceable contract in light of language in successive drafts of the agreement which provided, in essence, that the production company would not be contractually bound until the draft agreement was executed). The Seventh Circuit recently addressed this issue in *Venture Associates Corporation v. Zenith Data Systems Corporation,* 987 F.2d at 432–33. In *Venture,* the Court reasoned as follows:

> Here Venture and Zenith specified that any final agreement was subject to "the preparation and execution of a mutually satisfactory Purchase Agreement." This clearly evinces an intent not to be bound to the purchase and sale of Heath until

agreement had been reached on all details and a comprehensive contract signed. *Id.* (footnote omitted).[3] The cases relied upon by Indiana Hi–Rail merely reflect the other side of the coin. They stand for the proposition that where execution is *not* made a condition of the parties' agreement, the agreement's validity will not be determined by the presence or absence of a party's signature.

■ The Court concludes that CSXT was acting within its express rights under the Letter Agreement when it elected not to proceed with the line sale. Although the First Amendment extended the parties' closing date from August 31, 1989 to March 31, 1990, the proposed Second Amendment did not go into effect because it was never executed (countersigned) by CSXT. Significantly, the parties' Letter Agreement provided that it "[could] be supplemented, amended or modified at any time and in all respects *only by an instrument in writing executed by IHRC and CSXT.*" *Letter Agreement,* p. 9, ¶ 20 (emphasis added). Inasmuch as the proposed Second Amendment was not executed by both parties, it did not satisfy ¶ 20 of the Letter Agreement. Thus, the Letter Agreement was modified only once. Unfortunately for Indiana Hi–Rail, the parties' closing date (established by the First Amendment) came and went without an agreement having been reached.

■ Indiana Hi–Rail can hardly claim to have been unaware that the proposed Second Amendment would not go into effect until it was countersigned by CSXT. *See Mason & Dixon Lines, Inc. v. Glover,* 975 F.2d 1298, 1304–1305 (7th Cir.1992).[4] Indiana Hi–Rail was aware that (1) the Letter Agreement required the execution of written modifications by *both* parties, *see Reprosystem, B.V. v. SCM Corporation,* 727 F.2d 257, 262 (2d Cir.), *cert. den.* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984), (2) the first two drafts of the proposed Second Amendment contained a conspicuous legend which indicated they ·were "DRAFT DOCUMENT[S] FOR DISCUSSION PURPOSES ONLY" and that CSXT's signature was required, and (3) CSXT Director Jameson's Letter of August 17, 1990, which accompanied the last draft of the proposed Second Amendment, had stated that Indiana Hi–Rail should execute the enclosed originals of the proposed "Second Amendment to Purchase and Sale Agreement," and "return them to [Jameson] *for CSXT execution.*" (emphasis added).

■ The parties' pleadings and papers indicate that "a great deal of time, effort and money [were expended] in joint, and ultimately unsuccessful, efforts" to reach an agreement with respect to the sale of the Richmond–Fernald line. *Plaintiff's Memorandum in Opposition to Motion to Dismiss,* p. 11. The parties' lack of success does not, however, give the Court license to rewrite the parties' Letter Agreement or to turn a blind eye to the fact that the proposed Second Amendment was not executed by CSXT. *Fetz v. Phillips,* 591 N.E.2d 644, 647–648 (Ind.App.1992); *Wilson v. Elliott,* 589 N.E.2d 259, 264 (Ind.App.1992); *see also Stenograph Corporation v. Fulkerson,* 972 F.2d 726, 729 (7th Cir.1992) (rejecting, on the ground that the parties' settlement agreement was unam-

---

**3.** The *Venture* Court ·ultimately disagreed with the district court's conclusion regarding the assertion that Zenith had failed to negotiate in good faith. While the Court reversed the district court on that basis, it must be noted that in *Venture* the parties' preliminary agreement specifically provided that the parties would negotiate in good faith. *Id.,* 987 F.2d at 433.

**4.** Indiana Hi–Rail suggests that the "probative weight" of the Letter Agreement's requirement that all amendments and modifications must be in writing "is small indeed in comparison to the· contemporaneous evidence concerning the negotiation of the Second Amendment and the parties' course of conduct at that time." *Plaintiff's Memorandum,* p. 13, n. 8. The Court disagrees. The fact that the parties continued to negotiate following the expiration of the closing date which was set by the First Amendment, or that they were attempting to forge an agreement to extend again the closing date, hardly compels the conclusion that the "in writing" requirement was somehow excised from the parties' overall agreement. *Mason & Dixon Lines, Inc.,* 975 F.2d at 1305 ("In August 1988, the plaintiffs could not rely upon Glover's verbal assurances that he [alone] could agree to a settlement in light of his prior written statement [that the other trustees would have to approve of any settlement agreement before there could be a settlement].""). It is noted that the First Amendment specifically provided that except as otherwise modified the Letter Agreement would remain "in full force and effect."

biguous, the plaintiff's argument that the Court should reform the agreement).[5] Of course, even if the Second Amendment had become effective without CSXT's signature, the broad language which the parties used in their termination provision would have permitted CSXT to derail the proposed line sale without breaching the amended. Letter Agreement. As explained *supra*, the First Amendment's revised Section 18 permitted termination of the Agreement if for any reason closing did not occur *by March 31, 1990*, and subsection (f) thereof provided that the Letter Agreement could also be terminated without further liability or obligation to either party if "*CSXT, in its sole discretion, determines that the federal income tax consequence of the installment sale contemplated hereby is unacceptable to it.*" *Id.*, p. 2–3, ¶ 5 (emphasis added). Because both. conditions were satisfied, CSXT was entitled to terminate the amended Letter Agreement.

The principles of law governing the Court's resolution of Indiana Hi–Rail's promissory estoppel argument are easily summarized. "An estoppel arises when one party has made a misleading representation to another party and the other party has reasonably relied to his detriment on that representation." *Mason & Dixon Lines, Inc. v. Glover*, 975 F.2d at 1305 (*quoting Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990)). As the Indiana Court of Appeals recently explained:

> The elements of an estoppel are: 1) a representation or concealment of material facts; 2) such representation made with knowledge of the facts; 3) the party to whom it is made must be ignorant of the matter; 4) it must be made with the intent that the other party should act on it; and 5) the other party must be induced to act on the representation to his detriment.

*Heredia v. Sandler*, 605 N.E.2d 1212, 1217 (Ind.App.1993) (*citing Hammes v. Frank*, 579 N.E.2d 1348, 1358 (Ind.App.1991), *trans. dismissed*).

■ Assuming, *arguendo*, that the doctrine of promissory estoppel even applies in this case, which would require that the modification of the parties' Agreement survive the Statute of Frauds, *Defendant's Brief*, p. 22, n. 16 (*citing Whiteco Industries, Inc. v. Kopani*, 514 N.E.2d 840, 844 (Ind.App.1987)), the Court agrees that Indiana Hi–Rail's Complaint fails to state a claim. Indiana Hi–Rail suggests that:

> [the] promise was *implicit* in Mr. Jameson's August 17, 1990 letter, in CSXT's actions after that date in working with IHRC and IHRC's attorneys in the arbitration proceeding to clear the last obstacle to closing, and in its failure for a period of more than two months to say anything to IHRC indicating that it had not signed the Second Amendment and did not regard itself as being under any obligation to consummate the transaction.

*Plaintiff's Memorandum*, pp. 20–21 (emphasis added). CSXT argues that the foregoing "facts" do not demonstrate that CSXT promised to sign and adhere to the proposed Second Amendment, or that Indiana Hi–Rail detrimentally relied upon what it describes as an "implicit promise." *CSXT's Reply Brief*, pp. 16–18.

Indiana Hi–Rail's promissory estoppel argument is without merit. Construing the facts in the light most favorable to the nonmoving party, there is simply no evidence that CSXT promised Indiana Hi–Rail that it would execute the proposed Second Amendment. Even if Indiana Hi–Rail could base this action on an "implied promise," the August 17, 1990 letter could not logically be interpreted as such. *See U S West Financial Services, Inc. v. Tollman*, 786 F.Supp. at 344 ("without a clear and unambiguous promise there is no promissory estoppel") (*citing Reprosystem, B.V. v. SCM Corporation, supra*, 727 F.2d at 264–265). The letter merely described the order of execution of the proposed Second Amendment. Because the letter stated that a copy of the Second Amendment would be returned to Indiana Hi–Rail once it was fully executed (signed by both parties' principals), Indiana Hi–Rail was

---

5. In view of the Court's conclusion that the proposed Second Amendment did not become effective because the Amendment was not countersigned by CSXT, it is unnecessary to resolve CSXT's alternative argument that the proposed Second Amendment does not survive scrutiny under the Statute of Frauds. *See Elvin Associates v. Franklin*, 735 F.Supp. 1177, 1182, n. 6 (S.D.N.Y.1990).

clearly put on notice that it should inquire further if it wanted to be sure that the closing date had actually been extended. Additionally, Indiana Hi–Rail could not have reasonably relied on such a "promise" in light of the Letter Agreement's requirement that all amendments and modifications must be in writing and signed by both parties. *Mason & Dixon Lines, Inc.,* 975 F.2d at 1305.

Finally, the Court fails to discern any support for the proposition that an implied obligation of good faith limited CSXT's right to terminate the parties' Agreement or, assuming that it did limit CSXT's right to terminate, any evidence that CSXT failed to bargain or negotiate with Indiana Hi–Rail in good faith. *Implement Service, Inc. v. Tecumseh Products Co.,* 726 F.Supp. at 1180 (*quoting Communications Maintenance, Inc. v. Motorola, Inc.,* 761 F.2d 1202, 1210 (7th Cir.1985) (applying Indiana law, court refused to read good faith requirement into the parties' termination clause, noting that the parties had made clear their intent where clause provided either party could terminate "with or without cause")); *see also First Federal Savings Bank v. Key Markets,* 559 N.E.2d 600, 604 (Ind.1990). What was said in *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 873 F.2d 155, 159 (7th Cir.1989) (citation omitted), applies here:

> In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith.

*Id. (quoted in Phoenix Mutual Life Insurance v. Shady Grove Plaza Ltd.,* 734 F.Supp. 1181, 1190 (D.Md.1990)).

### III. *Conclusion*

For the foregoing reasons, the plaintiff's Request for Oral Argument is DENIED, and the defendant's Motion to Dismiss is GRANTED. This cause is hereby DISMISSED with prejudice.

It is so ORDERED.